12]          JANUARY TERM, 1924.          47

Minneapolis, St. P. & S. S. M. R. Co. v. Railroad Comm. 183 Wis. 47.

MINNEAPOLIS, ST. PAUL & SAULT STE. MARIE. RAILWAY
    COMPANY, Respondent, vs. RAILROAD COMMISSION OF
    WISCONSIN, Appellant.

*January 18—February 12, 1924.*

*Railroads: Regulation of issues of securities: By the states: By
    Congress: Payment of fees to state: Duress: Constitutional
    law: Control of interstate commerce by Congress: Extent:
    Effect on state regulations.*

1. The old rule that there could be duress only where there was a
    threat of loss of life, limb, or liberty has been so changed
    that duress may sometimes be implied when a payment is
    made or an act performed to prevent great property loss or
    heavy penalties, when there seems no adequate remedy except
    to submit to an unjust or illegal demand and then seek redress
    in the courts. p. 56.
2. Where a railroad company engaged in interstate commerce was
    required to obtain the permission of the railroad commission
    to the issuance of securities and to pay the commission fees
    as provided for by statutes declaring issues of securities void
    unless authorized by the commission and imposing heavy pen-
    alties for noncompliance, and the railroad company paid the
    fees under protest with notice that it would promptly take
    steps to recover back the money paid, the payment of the
    fees was under duress and not voluntary. p. 56.
3. The plaintiff is not relying on a statute or seeking to enforce
    any rights under it and at the same time assailing it; but
    claims that the statute relied on by the state was superseded
    by the federal statute, which undoubtedly raises a federal
    question. *Pera v. Shorewood,* 176 Wis. 261, distinguished.
    p. 54.
4. State statutes relating to the issuance of securities are super-
    seded by sec. 20a of the federal Transportation Act, which
    prohibits carriers from issuing them without the authority of
    the interstate commerce commission, since under such statute
    Congress, through the agency of such commission, has as-
    sumed exclusive control over such securities. p. 59.
5. When a statute is reasonably susceptible of two interpretations,
    by one of which it would be clearly constitutional and by the
    other of which its constitutionality would be doubtful, the
    interpretation rendering the statute constitutional should be
    adopted. p. 59.

6. A federal statute will not be construed to supersede the reserved powers of a state unless the purpose to do so is clearly manifested.  p. 59.

7. Sec. 20a of the Transportation Act, giving the interstate commerce commission exclusive control over the issuance of securities by railroads engaged in interstate commerce and depriving the states of power to regulate their issuance, is constitutional, as Congress may well have believed that the conflicting regulations existing in the several states relating to the issuance of securities, and the high fees assessed thereupon by some of the states, imposed unreasonable burdens on interstate commerce.  p. 60.

8. Under the federal constitution, giving Congress the broad power to regulate commerce between the states, it may, in the exercise of that power, enact statutes which operate to modify or supersede state legislation which seeks to control or regulate interstate commerce.  p. 61.

9. Said sec. 20a does not attempt to regulate the purely internal and governmental functions of railroads, the statute being a regulation of their business, in view of the financial problem with which they are constantly faced, and the relation between such problem and the ability of the railroad to efficiently serve the general public.  p. 62.

10. The power over commerce among states conferred upon Congress does not refer to matters or things which have no real or substantial relation to some part of such commerce; but the power of Congress extends incidentally to every instrumentality or agency by which such commerce is carried on.  p. 62.

11. When state legislatures undertake to restrict the power of carriers doing an interstate business to raise money vitally necessary for carrying on their commerce between the states, that legislation is dealing with an instrumentality of commerce.  p. 63.

12. In the absence of federal action, effect will not be denied to state legislation within its proper field until such authority is limited through the exertion by Congress of its paramount constitutional authority.  p. 64.

13. If by the federal constitution Congress is given express power to legislate in respect to a particular subject and does so legislate, it takes possession of the field, and such action supersedes any state regulation in regard to the same matter.  p. 64.

14. Congress is empowered to provide the law for the government of interstate commerce, to adopt measures to promote its growth and safety, and to foster, protect, control, and restrain it.  p. 65.

15. Wherever the interstate and intrastate transactions of carriers are so related that the government of one involves the control of the other, Congress, and not the state, may prescribe the dominant rule.   p. 65.

16. Under its power to regulate interstate commerce, Congress may establish uniformity in the mode of regulating the issuance of securities by carriers engaged in such commerce.   p. 65.

APPEAL from a judgment of the circuit court for Dane county: E. RAY STEVENS, Circuit Judge. *Affirmed.*

Judgment herein was entered after the time to plead, limited in an order of Circuit Judge W. B. QUINLAN overruling a demurrer to the complaint, had expired.

For the appellant there was a brief by the *Attorney General* and *Robert M. Rieser,* deputy attorney general, and oral argument by *Mr. Rieser.*

*John L. Erdall* of Minneapolis, for the respondent.

JONES, J.   Action by the *Minneapolis, St. Paul & Sault Ste. Marie Railway Company* against the *Railroad Commission of Wisconsin* to recover $2,500, the amount of fees collected from the railway company for granting authority to issue certain bonds.

The complaint alleged that the railroad company was organized under the general laws of Michigan, Wisconsin, Minnesota, and the territory of North Dakota; that, on the basis of earnings, its interstate business during the year 1920 amounted to 80.5 per cent. and its intrastate business amounted to 19.5 per cent. of its entire business; that prior to September 1, 1921, plaintiff had incurred indebtedness in the sum of $11,771,060.49, which sum must presently be paid; that it was necessary to borrow not less than $10,000,000 in order to meet these obligations; and that it was impossible for plaintiff to furnish security except by the issuance of bonds under its first refunding mortgage.

It was then alleged that, after due application had been made, the interstate commerce commission granted permission to plaintiff to issue $10,000,000 of six and one-half

per cent. notes payable ten years from September 1, 1921, and $15,000,000 of six per cent. first-mortgage bonds to mature in July, 1946; $12,500,000 of which were to be deposited as collateral security for the payment of the ten-year notes, and the remainder to be placed in the treasury of the railroad company pending further orders of the *Commission.*

Certain sections of the Wisconsin statutes were then set out. These sections provide, in substance, that no public-service corporation shall issue securities without first having obtained from the *Railroad Commission of Wisconsin* authority to do so; that securities issued without this authority shall be void; that penalties shall be imposed upon any public-service corporation which issues securities without such authority; and provide further that before a certificate of authority shall be given there must first be paid to the *Commission* certain fees, which fees shall be paid into the common school fund income by the *Commission.* It was then alleged:

"That it was impossible for it to sell its notes, collaterally secured by said refunding mortgage bonds, without complying with the Wisconsin laws before referred to. That in order to escape the penalties provided for in said laws, and to enable plaintiff to market its securities, it became necessary for the plaintiff to apply to the *Railroad Commission of Wisconsin* for authority to issue such securities, and also to pay the fees."

"That as a condition to granting authority to issue said securities, the *Railroad Commission of Wisconsin* positively and unqualifiedly required the plaintiff to pay fees amounting to $2,500; that such fees were computed as follows:

| | | |
|---|---|---:|
| $100,000 at $1.00 per thousand | .......... | $100 00 |
| 400,000 at .50 per thousand | .......... | 200 00 |
| 22,000,000 at .10 per thousand | .......... | 2,200 00 |

$2,500 00

"That plaintiff paid said fees under protest."

Minneapolis, St. P. & S. S. M. R. Co. v. Railroad Comm. 183 Wis. 47.

The reasons alleged as the basis of the protest were, in substance, that, assuming the Wisconsin laws to be valid, the fees should have been assessed against the $10,000,000 only; that sec. 20a of the Transportation Act, which gives the interstate commerce commission jurisdiction of the issuance of securities by railroad companies, superseded the Wisconsin laws on that subject.

It was then alleged that the *Commission* had been notified that plaintiff would promptly take steps to recover the money paid under protest; that the money was still in the possession of the *Commission;* and the plaintiff as a part of its protest further notified the *Railroad Commission* that the payment of said fees by the plaintiff to the *Commission* was made involuntarily and under duress and without waiving the assertion and claim that the assessment was illegal, unauthorized, and void, and that said payment was made solely to escape the penalties prescribed by state laws and to enable the plaintiff to issue its securities as aforesaid, which was absolutely necessary to the carrying on of the business of the plaintiff as a common carrier. Plaintiff further notified the *Commission* as a part of the protest that proceedings would be promptly taken to recover the money so paid under protest, and notified the *Commission* not to disburse the money so paid to it until the legality of the fees could be finally determined. It was then alleged that the *Railroad Commission,* pursuant to the application made to it as aforesaid, made and entered its order authorizing the issuance of the securities.

Judgment was prayed against the *Commission* in the sum of $2,500.

The *Railroad Commission* demurred to the complaint on the ground that it did not state facts sufficient to constitute a cause of action.

The trial court concluded that "the payment in the first instance was under duress; that Congress had power to legis-

late on the subject matter in question; and that sec. 20a of the Transportation Act supersedes and nullifies the Wisconsin statutes referred to." The trial court was of the opinion that in any event the plaintiff would be liable only for the fee on the $10,000,000 issue, $1,250. The demurrer was overruled and judgment ordered in favor of plaintiff for $2,500.

The principal provisions of sec. 20a of the Transportation Act of February 28, 1920, which are material to this inquiry read as follows:

"(2) From and after 120 days after this section takes effect it shall be unlawful for any carrier to issue any share of capital stock or any bond or other evidence of interest in or indebtedness of the carrier (hereinafter in this section collectively termed 'securities') or to assume any obligation or liability as lessor, lessee, guarantor, indorser, surety, or otherwise, in respect of the securities of any other person, natural or artificial, even though permitted by the authority creating the carrier corporation, unless and until, and then only to the extent that, upon application by the carrier, and after investigation by the commission of the purposes and uses of the proposed issue and the proceeds thereof, or of the proposed assumption of obligation or liability in respect of the securities of any other person, natural or artificial, the commission by order authorizes such issue or assumption. The commission shall make such order only if it finds that such issue or assumption: (a) is for some lawful object within its corporate purposes, and compatible with the public interest, which is necessary or appropriate for or consistent with the proper performance by the carrier of service to the public as a common carrier, and which will not impair its ability to perform that service, and (b) is reasonably necessary and appropriate for such service."

"(6) Upon receipt of any such application for authority the commission shall cause notice thereof to be given to and a copy filed with the governor of each state in which the applicant carrier operates. The railroad commissions, public-service or utilities commissions, or other appropriate state authorities of the state shall have the right to make before the commission such representations as they may

deem just and proper for preserving and conserving the rights and interests of their people and the states, respectively, involved in such proceedings. The commission may hold hearings, if it sees fit, to enable it to determine its decision upon the application for authority.

"(7) The jurisdiction conferred upon the commission by this section shall be exclusive and plenary, and a carrier may issue securities and assume obligations or liabilities in accordance with the provisions of this section without securing approval other than as specified herein." 41 U. S. Stats. at Large, pp. 494, 495, ch. 91.

It is the first proposition in the argument of defendant's counsel that plaintiff cannot claim under a statute and at the same time assail it. In their brief they say that the effect of the action of plaintiff is equivalent to saying:

"We have asked you for this certificate, we have gone through this proceeding on the assumption that you are authorized to act; but now that you have acted, and we have the benefit of the prestige of your order and the rights accruing by reason thereof, we say to you, 'You are holding us up, we are being forced, we are helpless, and we want our money back.' "

They argue that the application for the certificate was not the result of duress, but the result of deliberate judgment; that such procedure would result in material benefit that would be gained by obtaining the certificate of the *Railroad Commission* on account of the security afforded investors in the disposition of the funds raised from the sale of bonds under direction of the *Commission.*

Counsel cite as authority for this argument the recent case of *Pera v. Shorewood*, 176 Wis. 261, 186 N. W. 623. In that case a village was divided into business and residential districts by an ordinance under a statute. A property owner under the provisions of the statute filed a claim for damages. because his property was placed in the residential district and he was prevented from carrying on most kinds of business. He stated in the claim that he submitted it without prejudice

54    SUPREME COURT OF WISCONSIN.    [Feb.

Minneapolis, St. P. & S. S. M. R. Co. v. Railroad Comm. 183 Wis. 47.

to contest the validity of the ordinance. The claim was disallowed and the owner appealed.

The claim was based solely upon the ordinance and the statute. This court held that the filing of the claim asserted the validity of the ordinance and the statute, otherwise the plaintiff could not contend that his claim had any validity; that in taking the appeal to the circuit court he did so as an aggrieved party, again asserting by his acts the validity of the ordinance and relying on it as the valid basis for his claim; that since he instituted his action upon the sole basis of the validity of the ordinance, he could not seek to maintain it by asserting the invalidity of that which enabled him to come into court.

The distinction between the two cases is very plain. In this action plaintiff is not relying on the Wisconsin statute or seeking to enforce any claim under it. On the contrary, it is claimed that the statute relied on by defendant was superseded by the federal statute, and that is undoubtedly a federal question.

In *Union Pac. R. Co. v. Public Serv. Comm.* 248 U. S. 67, 39 Sup. Ct. 24, a similar question as to estoppel and duress was presented. In that case a Utah corporation operating a railroad through several states with but slight mileage and no intrastate business in Missouri sought to issue a large amount of bonds under a mortgage of its whole line and was charged a large fee for the privilege by the Missouri commission. The supreme court of the state held that the application to the commission was voluntary and that the railroad company was estopped to decline to pay the statutory compensation. The United States supreme court held that it was its duty to examine whether there was any basis for a finding that the federal right had been waived, and on the subject of duress the court said (p. 70):

"On the facts we can have no doubt that the application for a certificate and the acceptance of it were made under duress. The certificate was a commercial necessity for the

issue of the bonds.   The statutes, if applicable, purported to invalidate the bonds and threatened grave penalties if the certificate was not obtained.   The railroad company and its officials were not bound to take the risks of these threats being verified.   Of course, it was for the interest of the company to get the certificate.   It always is for the interest of a party under duress to choose the lesser of the two evils. But the fact that a choice was made according to interest does not exclude duress.   It is the characteristic of duress properly so called.   *The Eliza Lines,* 199 U. S. 119, 130, 131, 26 Sup. Ct. 8.   If, as may be, the supreme court of the state regards or will regard this statute as inapplicable (*Public Serv. Comm. v. Union Pac. R. Co.* 271 Mo. 258, 197 S. W. 39), probably the state would not wish to retain the charge, but we repeat, the railroad company was not bound to take the risk of the decision, and no proceeding has been pointed out to us by which it adequately could have avoided evils that made it practically impossible not to comply with the terms of the law.   *Atchison, T. & S. F. R. Co. v. O'Connor,* 223 U. S. 280, 286, 32 Sup. Ct. 216."

Counsel for the State argue that this decision is not applicable for the following reasons: that the railroad company was not incorporated in Missouri, and did only an interstate business; that the supreme court did not hold invalid the Missouri statute; that the fees were disproportionate to the services performed and the burdens assumed by the state; but that in the present case the carrier was incorporated in Wisconsin; that the law which gave life to the corporation places limitations on the powers so granted, and, among others, the issue of stocks and bonds, which are now attempted to be changed by the federal government; and that the plaintiff in this case is attacking the validity of the entire statute so far as it relates to intrastate commerce.

It is true that the decision does not expressly pass upon the validity of the Missouri statute.   It makes no reference to the place where the company was incorporated.   The decision does hold that on the facts the charge was an unlawful interference with interstate commerce.   We have cited and

quoted from that decision as a federal authority quite controlling on the question of duress. On that subject we do not consider that there is any material distinction between it and the case at bar.

The old rule that there could be duress only where there was a threat of loss of life, limb, or liberty has been so changed that duress may sometimes be implied when a payment is made or an act performed to prevent great property loss or heavy penalties when there seems no adequate remedy except to submit to an unjust or illegal demand and then seek redress in the courts. This was illustrated in the case cited above, and there may be circumstances under which the payment of a tax may be under duress. *Atchison, T. & S. F. R. Co. v. O'Connor,* 223 U. S. 280, 32 Sup. Ct. 216.

In the present case the complaint contains no allegations of threats; but it does contain averments showing the necessity of issuing the bonds, the provisions of the Wisconsin statutes declaring issues of the kind in question void unless they are with the authority of the *Railroad Commission,* and imposing heavy penalties for noncompliance. There is the further allegation that it was impossible to sell the securities without complying with the Wisconsin statute.

The plaintiff thus faced the situation that unless it complied with the statute it deemed illegal there would be inflicted the most serious injury without a remedy. We do not think that under such circumstances the application for the permit and the payment of the fees were voluntary.

It is the second contention of defendant's counsel that sec. 20a of the Transportation Act, when properly construed, does not deny the jurisdiction of the defendant *Commission* over the issuance of corporate securities by railroad companies.

In this connection it is claimed that the regulation prescribed in the section of the statutes above mentioned does not go to a regulation of commerce or of the methods of doing business; that it is not a regulation of the business of

the corporation, but of its purely internal and governmental functions. It is further argued that to sustain the claim of the plaintiff would amount to holding that the Transportation Act may operate as an amendment of the charters of corporations conferred by the state which has created them, and that so far as railroads engage in interstate business they have one kind of power and so far as they engage in intrastate business they have another. These objections will be referred to later in the opinion.

It is also claimed that sec. 20a is to be construed in connection with the sections preceding it, and that since the statute in several places refers to action by the state, the general power regulating the issue of securities must be held to have been intended to be exercised concurrently with the state authorities.

The Transportation Act, with its amendments, is very long and deals with many subjects, and in numerous instances refers to action which may be taken by state governments; for example, it is provided in sec. 1 (17):

"That nothing in this act shall impair or affect the right of a state, in the exercise of its police power, to require just and reasonable freight and passenger service for intrastate business, except in so far as such requirement is inconsistent with any lawful order of the commission made under the provisions of this act."

Control is given the interstate commerce commission over extensions and abandonment of railroad lines, and provision is made for notice to the governor of the state or states interested, with the right to be heard. But it is provided that no other certificate for the extension or abandonment need be obtained than that of the interstate commerce commission.

So in the sections relating to the consolidation of railroads notice is required to be given to the states in which the properties affected are situated; provision is made for public hearings, and the interstate commerce commission may enter its order under the conditions stated in the act, "the law of

any state or the decision or order of any state authority to the contrary notwithstanding." Sec. 5 (6) (c), Transportation Act.

In the sections relating to discriminations and rates there are similar provisions for notice to state authorities. Authority, under certain conditions, is given to the interstate commerce commission to prescribe the rates to be charged and the regulation or practice to be observed, "the law of any state or the decision or order of any state authority to the contrary notwithstanding." Sec. 13 (4), Transportation Act.

We find nothing in the preceding sections of the Transportation Act which indicates any intention on the part of Congress to divide with the several states the power to regulate interstate commerce, although, as in the section now involved, they impliedly at least invite the co-operation of the state authorities in order that all pertinent facts may be ascertained before the final order is made.

Some reliance is placed by counsel for the State on the clause "even though permitted by the authority creating the carrier corporation," found in sec. 20a. It is argued that Congress had in mind that it had not the power to modify the provisions of corporate charters and that the powers of the interstate commerce commission should only extend to superintending and reviewing the action of the state authorities.

Sec. 20a begins with language which is in effect a prohibition against the issue of capital stock or bonds unless certain conditions are complied with and unless authorized by the interstate commerce commission. In our opinion the clause above referred to only tends to emphasize the legislative intent that the regulation of interstate commerce rested in Congress and not in the states. Congress doubtless had in mind that there were about forty states in which there were existing statutes regulating the issue of stocks and bonds of carriers. The clause referred to creates no

exception to the prohibitory language of the statute, but seeks to make plain that, notwithstanding any action of state authorities, the order of the interstate commerce commission is controlling.

If there were any doubt on this subject it would seem to be removed by paragraph (7) of the section, which expressly declares that the jurisdiction of the commission shall be "exclusive and plenary" and that securities may be issued "in accordance with the provisions of this section without securing approval other than as specified herein."

We cannot agree with counsel for the State that there is any language in this section which can be construed as a limitation upon the powers of the commission or as recognizing concurrent jurisdiction with the several states. On the contrary, it seems to us an assertion of the exclusive and undivided power of Congress, through the agency of the interstate commerce commission, to control the issue of the kind of securities named in the statute. It is the meaning of the statute that state legislation inconsistent with its terms is superseded.

We agree with counsel for the State that when a statute is reasonably susceptible of two interpretations, by one of which it would be clearly constitutional and by the other of which its constitutionality would be doubtful, the former should be adopted. We also agree that in construing federal statutes it should not be held that Congress intends to supersede the reserved powers of a state except so far as its purpose to do so is clearly manifested. In coming to the conclusion above stated we have had in mind these rules of construction.

It is the next contention of counsel for the State that if sec. 20a is so construed as to deprive the state of power to regulate the issuance of securities by its railroad corporations, it is unconstitutional.

It is claimed that Congress has no power under the commerce clause of the constitution to regulate intrastate affairs

60      SUPREME COURT OF WISCONSIN.    [Feb.

Minneapolis, St. P. & S. S. M. R. Co. v. Railroad Comm. 183 Wis. 47.

unless the particular regulation is necessary to remove an actual and direct burden on interstate commerce. Counsel for plaintiff claim that state regulation of the issuance of securities is such a burden when it relates to carriers doing interstate commerce.

In the briefs of both parties reference is made to the conditions existing when the statute in question was enacted, and to the reports of the interstate commerce commission, and other documents urging the necessity of legislation giving to Congress control over the subject. These documents show and it is a matter of general knowledge that before there was regulation of the issue of securities financial disaster often came to railroads, causing not only loss to investors but also impairment of the ability to render proper service to the general public; that before the enactment of sec. 20a there were conflicting statutes in many states; that when a railroad passed through numerous states these statutes caused great embarrassment and delay in raising funds necessary for proper equipment and operation of the lines. In some states very high fees were collectible under the statutes, amounting to exactions for revenue purposes.

Under these conditions Congress may well have believed that these conflicting regulations in many states, and the embarrassment and delays they caused, imposed unreasonable burdens on interstate commerce. In a very recent opinion by Mr. Justice Brandeis it was held that a Minnesota statute providing that any foreign corporation's agent soliciting freight and passenger traffic may be served with process, when construed by the supreme court of Minnesota as not being limited to suits arising out of business transactions in Minnesota, and as including suits when plaintiff is not and never has been a citizen of the state, was unconstitutional as unreasonably burdening interstate commerce. *Davis v. Farmers' Co-op. E. Co.* 262 U. S. 312, 43 Sup. Ct. 556.

It is argued that the fee provided by the Wisconsin stat-

ute is not unreasonable and therefore not burdensome; but the federal statute was enacted to meet a general condition and to have general application.

It is further argued by counsel for the State that the state and federal statutes are not in conflict; that both were enacted for the same general purpose. This is doubtless true. But on the one hand we have a state statute asserting jurisdiction over a given subject; on the other hand, an act of Congress asserting plenary and exclusive jurisdiction over the same subject. A commission duly appointed is acting and exercising the authority conferred by the federal statute. So far as relates to the control of interstate commerce, we are unable to see how the two statutes can be reconciled with each other.

Counsel for the State frankly concede the dominant power of the federal government in matters affecting interstate commerce, and that Congress has power to supersede state regulations with respect to interstate carriers in those cases where the state legislation hampers or burdens interstate commerce, or where such legislation is inconsistent with federal legislation.

These propositions have been well settled by a long line of decisions beginning with *Gibbons v. Ogden,* 9 Wheat. 1, in which Mr. Chief Justice MARSHALL, speaking of the constitutional power to regulate commerce, said (p. 196):

"This power, like all others vested in Congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations other than are prescribed in the constitution."

It is argued by counsel for the State that the construction we have given to the federal statute would in effect modify the laws of the state creating the corporation, and that this is beyond the power of Congress. We have no doubt that under the federal constitution giving Congress the broad power to regulate commerce between the states, in the exercise of that power it may enact statutes which operate to

modify or supersede state legislation which seeks to control or regulate interstate commerce.

In a case where it was claimed that a corporation was created by a state and was therefore not subject to the regulation under consideration, the court said:

"We cannot conceive how it is possible for any one to seriously contend for such a proposition. It means nothing less than that Congress, in regulating interstate commerce, must act in subordination to the will of the states when exerting their power to create corporations. No such view can be entertained for a moment." *Northern S. Co. v. U. S.* 193 U. S. 197, 345, 24 Sup. Ct. 436; *Houston, E. & W. T. R. Co. v. U. S.* 234 U. S. 342, 34 Sup. Ct. 833; *Minnesota Rate Cases,* 230 U. S. 352, 33 Sup. Ct. 729.

We cannot agree with counsel that the regulation prescribed by our statute is not a regulation of the business of the corporation but only of its purely internal and governmental functions.

The financial problem is constantly facing carriers. The great transportation corporations carrying on business between the states are the instruments of commerce. They are generally carrying heavy indebtedness. The ability to make provision for interest and principal as it matures is of vital importance. The inability to meet these obligations may lead and often has led to deterioration of the physical properties, and to disaster and bankruptcy, causing inefficiency in the service due to the general public.

The power over commerce among the states conferred upon Congress does not extend to matters or things which have no real or substantial relation to some part of such commerce, and counsel for the State have cited cases holding this rule: *Trade-mark Cases,* 100 U. S. 82, as to the regulation of trade-marks; *Smith v. Alabama,* 124 U. S. 465, 8 Sup. Ct. 564, as to a law requiring the examination and licensing of locomotive engineers operating interstate and intrastate trains; *Employers' Liability Cases,* 207 U. S. 463, 28 Sup. Ct. 141, as to restricting the defense of contributory

negligence; *Adair v. U. S.* 208 U. S. 161, 28 Sup. Ct. 277, as
to discharge of employees because of membership in a labor
union; *Hammer v. Dagenhart,* 247 U. S. 251, 38 Sup. Ct.
529, as to the child-labor law. But it is well settled by many
cases that the power of Congress over commerce extends
incidentally to every instrumentality or agency by which
such commerce is carried on. We might quote largely from
decisions in which this rule has been declared, but will only
cite a few: *Texas & Pac. R. Co. v. Rigsby,* 241 U. S. 33,
36 Sup. Ct. 482, as to the Safety Appliance Act; *Second
Employers' Liability Cases,* 223 U. S. 1, 32 Sup. Ct. 169, as
to regulation of liability of employers; *Baltimore & O. R.
Co. v. Interstate Comm. Comm.* 221 U. S. 612, 31 Sup. Ct.
621, and *Wilson v. New,* 243 U. S. 332, 37 Sup. Ct. 298, as
to regulation of hours of labor (Adamson Act) ; *Houston,
E. & W. T. R. Co. v. U. S.* 234 U. S. 342, 34 Sup. Ct. 833,
and *Railroad Comm. of Wisconsin v. C., B. & Q. R. Co.* 257
U. S. 563, 42 Sup. Ct. 232; *Minnesota Rate Cases,* 230 U. S.
352, 33 Sup. Ct. 729, as to regulation of intrastate rates when
necessary to protect interstate commerce; *Interstate Comm.
Comm. v. Goodrich T. Co.* 224 U. S. 194, 32 Sup. Ct. 436,
as to regulation of system of keeping accounts; *Adams Exp.
Co. v. Croninger,* 226 U. S. 491, 33 Sup. Ct. 148, as to
liability of interstate carriers under bills of lading issued by
them.

When state legislatures undertake to restrict the power of
carriers doing an interstate business to raise money vitally
necessary for carrying on their commerce between the states,
that legislation is dealing with an instrumentality of com-
merce. The Transportation Act proceeds on the theory that
there should be rates fair to the general public giving a fair
return to the carriers. These two objects are so closely con-
nected with the issue of stock and bonds that the regulation
of such issues has substantial relation to interstate com-
merce.

The latest decision of the United States supreme court

which has come to our attention is *Dayton-Goose Creek R. Co. v. U. S.* 44 Sup. Ct. 169, rendered January 7, 1924. After referring to other decisions it is said in the opinion by Mr. Chief Justice TAFT:

"In both cases it was pointed out that the Transportation Act adds a new and important object to previous interstate commerce legislation which was designed primarily to prevent unreasonable or discriminatory rates against persons and localities. The new act seeks affirmatively to build up a system of railways prepared to handle promptly all the interstate traffic of the country. It aims to give the owners of the railways an opportunity to earn enough to maintain their properties and equipment in such a state of efficiency that they can well carry this burden. To achieve this great purpose, it puts the railroad systems of the country more completely than ever under the fostering guardianship and control of the commission which is to supervise their issue of securities, their car supply and distribution, their joint use of terminals, their construction of new lines, their abandonment of old lines, and by a proper division of joint rates, and by fixing adequate rates for interstate commerce, and in case of discrimination, for intrastate commerce, to secure a fair return upon the properties of the carriers engaged."

It will be seen that the opinion directly recognizes the supervision of the issues of such securities as are now involved as within the jurisdiction of the interstate commerce commission. Of course we recognize the familiar rule that, in the absence of federal action, effect will not be denied to state legislation within its proper field until such authority is limited through the exertion by Congress of its paramount constitutional authority.

But it is an equally familiar rule, illustrated by the cases already mentioned and many others which might be cited, that if by the federal constitution Congress is given express power to legislate in respect to a particular subject and does so legislate, it takes possession of the field, and such action supersedes any state regulation in regard to the same matter.

Minneapolis, St. P. & S. S. M. R. Co. v. Railroad Comm. 183 Wis. 47.

This rule has been frequently recognized by this court (*State v. C., M. & St. P. R. Co.* 136 Wis. 407, 117 N. W. 686; *Konkel v. State,* 168 Wis. 335, 170 N. W. 715), and is the logical result of our form of government and the provision that "This constitution, and the laws of the United States which shall be made in pursuance thereof, . . . shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the constitution or laws of any state to the contrary notwithstanding." Par. 2, art. VI, Const. U. S.

The decisions already cited well establish the rule that Congress is empowered to provide the law for the government of interstate commerce; to adopt measures to promote its growth and safety; to foster, protect, control, and restrain; that wherever the interstate and intrastate transactions of carriers are so related that the government of one involves the control of the other, it is Congress and not the state that is entitled to prescribe the dominant rule.

We have already pointed out the conflicts and embarrassments which arose when there was lack of uniformity in the laws of many jurisdictions regulating the control of the issuance of securities. In order to protect and foster interstate commerce and to secure efficiency, Congress determined that there should be uniformity in the mode of regulating the issue of securities, as had been before provided concerning the keeping of accounts. It is well settled that Congress has the power to establish such uniformity in regulations affecting interstate carriers and that as to those subjects its authority is exclusive. *Houston, E. & W. T. R. Co. v. U. S.* 234 U. S. 342, 34 Sup. Ct. 833; *Minnesota Rate Cases,* 230 U. S. 352, 33 Sup. Ct. 729; *Adams Exp. Co. v. Croninger,* 226 U. S. 491, 33 Sup. Ct. 148.

It is our conclusion (1) that under the allegations of the complaint the payment of the license fee was not voluntary but under duress; (2) that it is the intent and meaning of

sec. 20*a* that Congress should assume exclusive control over such securities as are here involved; (3) that sec. 20*a* is constitutional.

In view of this conclusion it is not necessary to discuss the claim of plaintiff that the correct fee was not assessed.

*By the Court.*—Judgment affirmed.