WURTZ, Plaintiff-Respondent, v. FLEISCHMAN, Defendant-Appellant.†

Court of Appeals

*No. 78–110. Argued January 26, 1979.—Decided March 13, 1979.*
(Also reported in 278 N.W.2d 266.)

---

[5] *Garski v. State*, 75 Wis.2d 62, 75, 248 N.W.2d 425, 432 (1977).
[6] *Spannuth v. State*, 70 Wis.2d 362, 366–67, 234 N.W.2d 79, 81–82 (1975).
† Petition to review granted.

For the plaintiff-respondent, there was a brief and oral argument by *John R. Zwieg* of *Godfrey, Neshek, Worth, Howarth & Leibsle* of Elkhorn.

For the defendant-appellant, there were briefs and oral argument by *Lowell E. Sweet* of Elkhorn.

Before Moser, P.J., Brown, J., and Bode, J.

BROWN, J.   This is an appeal from a judgment of the circuit court entered in favor of the plaintiff-respondent (Wurtz). The judgment ordered that the defendant-appellant (Fleischman) transfer the deeds to certain property pursuant to a contract entered into on March 24, 1975.

Paul Wurtz was the owner of the Hotel Luzern which was located on the shores of Lake Geneva. He wanted to sell the hotel and hired L. William Fleischman, a real estate broker, to procure a purchaser. The hotel was listed for over a year at $350,000 without any serious prospective offers to purchase. Eventually, Fleischman became interested in the property and conceived an idea of turning the hotel into a Hilton Inn. Fleischman asked Wurtz if he was interested in the proposed project, but

Wurtz declined. Wurtz wanted cash of $300,000 and wanted to sell the property outright. Fleischman, on behalf of Lakeside Habitat, Inc., of which he had a participation interest, then began to negotiate with Wurtz for the purchase of the property.

After seeing his lawyer, Wurtz decided that he did not want cash in return for the hotel. Rather, he wanted to exchange the hotel property for real estate with a value equal to $300,000. By trading real property, Wurtz had been advised that he would receive a tax advantage. Fleischman agreed to exchange real estate rather than to give Wurtz cash, and the agreement was reduced to writing with the closing date to take place on October 10, 1973. Time was of the essence. Wurtz was to notify Fleischman of what property he wanted in exchange for the hotel property. Fleischman was to purchase the property and then trade the property for the hotel at the closing.

The date for closing was extended by written agreement of the parties to March 31, 1974. Again, time was of the essence. The reason for the extension was that Wurtz had originally asked Fleischman to obtain a McDonald's restaurant in Albuquerque, New Mexico as the exchange for the hotel. Fleischman had done so. The McDonald's restaurant was, however, valued at $246,400. Since the agreement had been for Fleischman to exchange $300,000 worth of real estate for the hotel, Fleischman had to find approximately $60,000 in additional property in order for Wurtz to have a tax deferred exchange. With this understanding, the closing was postponed so that Wurtz could select the necessary additional property. Eventually, Wurtz selected a warehouse in Delavan as the additional property to be bought by Fleischman on Wurtz' behalf.

The closing did not take place on March 31, 1974 as had been previously arranged. It was again postponed.

This time, however, there was neither a written agreement to postpone the closing nor a written waiver of the "time is of the essence" clause. The reason for the postponement is unclear from the record, but there is evidence that Fleischman was having trouble procuring the necessary financing to complete the transaction.

Although there was no written waiver of the "time is of the essence" clause, there is evidence that both parties continued to feel bound by the original agreement. It was agreed between Wurtz and Fleischman, for instance, that as compensation for agreeing to the postponement, Wurtz was to receive from Fleischman the equivalent of the income he would have received from the McDonald's restaurant and the Delavan warehouse each month had the closing taken place. This consent to monthly compensation is documented in a closing statement signed by Wurtz on February 1, 1975, almost one year past the date the transaction was supposed to have been closed by prior written agreement. Other documentary evidence includes the records from the closing conference which show that Wurtz did receive credit in the form of rental payments for the period of time between the date of the second postponement and the actual closing. Further, the record discloses that Wurtz and Fleischman were in almost daily contact throughout the second postponement period. It is evident that even though the "time is of the essence" clause was not specifically waived by Wurtz, the closing was still contemplated upon the terms and conditions outlined in the original offer to purchase agreement.

The controversy, in this case, occurred sometime after the March 31, 1974 agreed closing date but before the actual March 24, 1975 closing date. Fleischman contends that the evening before the actual closing, Wurtz told him in a telephone conversation that the closing was off unless Wurtz was paid an additional $50,000. Fleischman

states that he felt economically compelled to assent to the arrangement in order to avoid cancellation of the closing. It is his view that he had to assent to the extra $50,000 or face certain financial ruin. While he had no cash available, he offered Wurtz the only asset he had— his nine and one-half units of Lakeside Habitat developments worth $47,500. Wurtz accepted Fleischman's offer and the closing took place. Fleischman later refused to issue the units to Wurtz after the closing. Wurtz brought suit and the trial court awarded Wurtz the units. From this judgment, Fleischman appeals.

Wurtz claimed at trial and he claims on appeal that the $50,000 demand was first made two or three months before the actual closing date and not the night before as is alleged by Fleischman. Wurtz professes that since time was of the essence and the clause was not expressly waived at the time of the second postponement, he was under no obligation to go through with the closing. Wurtz asserts, therefore, that he was legally justified in seeking a modification of the contract calling for an increased consideration. He argues that there was no economic duress and maintains that he is entitled to specific performance as ordered by the trial court.

In discussing the doctrine of economic or business compulsion, we note that Wisconsin has adopted the doctrine as a viable defense to a contract. In *Minneapolis, St. Paul & Sault Ste. Marie Railway Co. v. Railroad Commission*, 183 Wis. 47, 197 N.W. 352 (1924), the court stated:

The old rule that there could be duress only where there was a threat of loss of life, limb, or liberty has been so changed that duress may sometimes be implied when a payment is made or an act performed to prevent great property loss or heavy penalties when there seems no adequate remedy except to submit to an unjust or illegal demand and then seek redress in the courts. 183 Wis. at 56, 197 N.W. at 355.

As late as 1960, the supreme court reaffirmed the adoption of the modern view which recognizes the existence of the doctrine.[1] While the court has adopted the doctrine of business or economic compulsion, the criteria to be used in determining whether a cause of action or defense exists for economic duress has not been specifically set forth by any court in this state. However, analysis of the criteria to be examined in economic duress has been the subject of a number of law review articles.[2] As the writer of an Iowa Law Review Note states, the courts which have adopted the modern view of economic duress have used many different formulas to determine whether or not a contract is voidable for economic or business compulsion. These formulas include the relative bargaining positions of the parties, the adequacy of alternative legal remedies, the gravity of the threatened evil, the wrongfulness or illegality of the threats, the fairness of the resulting bargain, and the ratification by the allegedly coerced party.[3]

Some of these criteria sound in quasi-contract and others sound in tort. There has been much discussion by academicians about the proper analytical framework into which economic duress falls. One thing is clear—when one party wrongfully threatens another with severe economic loss if he does not enter a proposed contract, and the threatened party acquiesces solely because of the wrongful threat, the injury to the threatened party may be redressed under the doctrine of economic duress. It is the application of a more consistent duress theory

---

[1] *Mendelson v. Blatz Brewing Co.*, 9 Wis.2d 487, 494, 101 N.W.2d 805, 809 (1960).

[2] *E.g.*, Dawson, *Economic Duress—An Essay in Perspective*, 45 MICH. L. REV. 253 (1947).

[3] Note, *Economic Duress After the Demise of Free Will Theory: A Proposed Tort Analysis*, 53 IOWA L. REV. 892–96 (1968) [hereinafter cited as *Proposed Tort Analysis*].

which we seek, and as a result of our research we hereby adopt the analytical formula as suggested in the Iowa Law Review Note. This formula involves the tort criteria of duty, breach, causation and damages.

Before we may analyze the elements of economic duress, we must determine the burden of proof Fleischman must meet in order to establish a defense. In cases involving intentional torts, the supreme court has adopted and applied a middle burden of proof. *See, Kuehn v. Kuehn,* 11 Wis.2d 15, 26–30, 104 N.W.2d 138, 145–47 (1960). Therefore, Fleischman must prove to a reasonable degree of certainty, by evidence that is clear, satisfactory and convincing, that the portion of the contract requiring that he deed his interest in the Lakeside Habitat development was a product of economic duress. *See, Kuehn v. Kuehn, supra;* Wis J I—Civil, Part 1, 205. Damages, however, need only be proven by the greater weight of the credible evidence. *Lang v. Oudenhoven,* 213 Wis. 666, 669, 252 N.W. 167, 168 (1934) ; Wis J I—Civil, Part 1, 1705.

## DUTY

The duty in economic duress cases is the duty to exercise superior economic power reasonably in a bargain situation.[4] Relative bargaining position should be determined from the entire context of the bargaining relation if it is to be meaningful in the duress analysis.[5] A party has a superior bargaining position if he is the sole effect or source of something needed by the other party to avoid a severe economic loss and the relationship is not reciprocal. The origin of the unequal bargaining

[4] *Proposed Tort Analysis, supra* note 3, at 906.
[5] *Id.*

power should be irrelevant. Once the superior bargaining position is established, the party has a duty to use the position reasonably to assure the weaker party a reasonable choice of alternatives.[6]

In the case before us, Wurtz, at the time of his demand for increased consideration, was in the good bargaining position while Fleischman was in an inferior one. Wurtz knew that Fleischman had spent a considerable amount of time and money putting the project together. In fact, Wurtz, being in daily contact with Fleischman, knew that Fleischman and his partners had spent $150,000 for the McDonald's and Delavan properties on Wurtz' behalf. Further, it was evident that if the closing did not take place as scheduled, Fleischman would not be able to sell the properties. The $150,000 would have been defaulted and reverted to the lender. Thus, Fleischman would have been bereft of $150,000.

Wurtz also knew that Fleischman had spent in excess of $35,000 in architectural fees to design a building to specifically fit the Hotel Luzern property. Had the closing not taken place, Fleischman would have spent $35,000 for naught. Fleischman had also spent $4,750 to bring the title up to date for closing, a cost which he, as buyer, had agreed to incur even though it is a cost that is normally undertaken by the seller. Fleischman further paid $1,500 in surveying fees, $10,500 in attorney fees for the necessary documents to close on the date scheduled and other attorney fees. In addition, Fleischman had a construction contract for $1,580,000 as well as $2,500 in other incidental expenses.

Fleischman contends that his whole financial well-being was dependent on successfully closing by the scheduled date and that failure to do so would have placed him in a situation of probable bankruptcy. Wurtz knew

---

[6] *Id.* at 908.

this. In his trial testimony, he characterized Fleischman's consent to the $50,000 demand as "involuntary."

Wurtz, on the other hand, had nothing to lose. First, he had another possible buyer available. Second, his lawyer was counseling him not to go through with the transaction for reasons unclear in the record. Third, during the life of the agreement and prior to closing, Wurtz was still able to run his Hotel Luzern business.

We conclude, therefore, that Fleischman had relied upon the contract to such an extent that the failure of Wurtz to perform would cause a disproportion of economic loss to him. Further, we do find that there was neither genuine negotiation between the parties, nor a counter-threat from Fleischman which might have forced Wurtz, as the allegedly coercing party, to make a concession. Wurtz had a superior bargaining position and was subject to the duty to use his economic power reasonably to assure Fleischman a reasonable choice of alternatives in his effort to avert serious economic loss.

## BREACH OF THE DUTY

In order to find a breach of duty in cases of economic duress, one must be found to have used his superior bargaining position unreasonably. Generally, courts have required a finding that there were threats which were wrongful. To be wrongful, however, the threats need not be unlawful. They merely need to be unreasonable or unjustifiable. The standard of justifiability used by the courts in economic duress cases should be a standard of commercial reasonableness.[7] Several criteria are contained in the Uniform Commercial Code for determining commercial reasonableness. Section 401.203, Stats., im-

---

[7] *Id.* at 912.

poses an obligation of good faith in the performance or enforcement of a contract or duty. Section 402.103(1) (b), Stats., defines good faith in a commercial transaction as "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade."

Applying these standards to the present case, we find that there was sufficient evidence to show that Wurtz' actions did not meet the standards of commercial reasonableness.

At trial, Wurtz claimed that he demanded the additional $50,000 as compensation for lost profits from the McDonald's and Delevan properties as a result of the delay in closing. However, the closing statement gave Wurtz a credit for $19,200 which represented the amount of money Fleischman had agreed to pay for lost profits as a result of the delay. This credit was in addition to the $50,000 demanded by Wurtz. Wurtz' justification for the $50,000 demand is, therefore, highly suspect and indicates that his concern for lost profits was not the reason for the additional demand. Furthermore, Wurtz admitted at trial that he possibly had another buyer for his property. This fact, taken together with the fact that Fleischman had already paid for lost profits, indicates that the $50,000 demand was made in bad faith with the intent to either scuttle the deal so he could sell the property to someone else or get an additional $50,000 above that by which he was equitably entitled. We find, therefore, that Wurtz' demand for the additional $50,000 above and beyond the payment already made for lost profits was unjustifiable.

In addition, Wurtz testified that the demand for the additional $50,000 was made two to three months prior to closing. However, the closing statement, signed by Wurtz shortly before the closing, made no reference to

the additional $50,000. The evidence, therefore, supports Fleischman's assertion that the demand was made the night before the closing. Even assuming the demand was made two months before the closing, we believe this conduct does not meet the commercial standards of fair dealing in the trade. The trade involved is commercial real estate. As a general rule, commercial sales involve a great deal of money, involve complicated financing arrangements and require a longer period of time to close. The offer to purchase, once accepted, is a contract on which both the buyer and the seller must rely to avoid financial difficulties. The buyer often makes other financial commitments in order to close the deal. Likewise, the seller may rely on the offer to purchase in making future investments. To permit either the buyer or the seller to change the terms of the contract at the last minute for an unjustified reason places commercial sales contracts in jeopardy. The purpose of the contract is to create certainty and stability in the commercial real estate trade. To permit last minute changes creates uncertainty and instability in a trade that demands certainty and stability. Therefore, we find that Wurtz' last minute, unjustified demand for the additional $50,000 did not meet reasonable commercial standards of fair dealing. Thus, he breached his duty to exercise his superior economic power reasonably in a bargaining situation.

## CAUSATION

In order to establish tort liability, it is necessary to show that the wrongful act of the tort-feasor caused the injury to the victim. In economic duress cases, the causation issue is reduced to the question of whether the victim would have acquiesced in the absence of the wrongful threat.[8] Thus, a factual finding that the wrongful threat

---

[8] *Proposed Tort Analysis, supra* note 3, at 917.

was communicated and understood is, of course, a prerequisite for a finding that the threat was the reason for the victim's acquiescence. In the present case, there is no dispute over the fact that the demand for the additional $50,000 was made by Wurtz and understood by Fleischman. The only real factual question is whether Fleischman would have acquiesced but for the wrongful threat of Wurtz.

Fleischman testified that he would not have acquiesced, but the testimony of the person alleging he was coerced is self-serving. To allow an opportunity for effective rebuttal of self-serving contentions, the court must rely heavily on indirect evidence of causation. Any test to determine causation in duress cases must, therefore, be primarily objective.[9]

The primary criteria to be used in applying an objective test for causation is whether the victim had an adequate legal remedy available to protect his interest at the time it was threatened.[10] If there was an adequate legal remedy, the victim's failure to use it is strong evidence that acquiescence was caused by factors other than the wrongful threat. The victim has the duty to show either that there was no legal remedy available or that, if there was a legal remedy, it was inadequate. To prove inadequacy of the legal remedy, he must show one of two things. He must prove that the availability of the remedy was not clearly apparent at the time of the threat or that the remedy would not clearly protect his interest. It is obvious that in some instances, the legal remedy available may be inadequate to protect the threatened interest for a variety of reasons. For example, the threatened action may cause irreparable harm before any legal steps would be effective, or the compensatory legal remedy

---

[9] *Id.*
[10] *Id.* at 917–18.

may fail to compensate the projected injury effectively.[11]

Using this criteria, we have no doubt that the evidence shows Fleischman acquiesced solely because of Wurtz' threat to refuse to close the deal. There was no adequate remedy available to Fleischman at the time the threat was made that would have protected him from financial disaster. The only possible remedy was for Fleischman to sue for specific performance, but this remedy was inadequate. Assuming Wurtz would have been ordered to close the transaction under the terms of the purchase contract, the delay in obtaining the judgment for specific performance would have forced Fleischman into financial ruin. Furthermore, any financial loss suffered by Fleischman as a result of the delay could not have been returned to him in a suit for specific performance. He, therefore, had no adequate legal remedy.

Even assuming, arguendo, that specific performance was an adequate remedy, Wurtz admitted at trial that Fleischman's acquiescence was involuntary. Since there is no other evidence to support a finding that Fleischman acquiesced for reasons other than Wurtz' threat, the only reasonable conclusion is that Wurtz' threat to refuse to close without the additional $50,000 caused Fleischman's acquiescence.

Based on the record and the foregoing analysis, we find that Fleischman has proven a defense of economic duress by the greater weight of the credible evidence.

### DAMAGES

Fleischman has claimed economic duress as a defense to a suit requesting that he be ordered to deed his interest

---

[11] *Id.* at 919.

in the Lakeside Habitat development to Wurtz. His interest was valued at $47,500. Having proven the defense of economic duress, Fleischman is entitled to his restitutionary remedy of invalidating that portion of the contract which requires that he deed the property to Wurtz. However, we note that economic duress is not only available as a defense to a suit on a contract, but also may be a separate cause of action or counterclaim. In such cases, the damages shall be the damages generally available for intentional torts. Damages may be awarded in such a sum as will compensate the injured party for his full pecuniary loss. This is the loss which is proven to a reasonable certainty to have flowed directly and necessarily from the acts of duress. Wis J I—Civil, Part II, 3710.

In determining what measure of damages will be used to compensate the injured party for his losses, Wisconsin has adopted the "benefit of the bargain" rule rather than the "out-of-pocket" rule for fraud cases. *Horweger v. Wilcox,* 16 Wis.2d 526, 534, 114 N.W.2d 818, 822 (1962); *Anderson v. Tri-State Home Improvement Co.,* 268 Wis. 455, 464, 67 N.W.2d 853, 859 (1955); *Kimball v. Antigo Building Supply Co.,* 261 Wis. 619, 621, 53 N.W.2d 701, 702 (1952); Annot., 124 A.L.R. 37 (1940); Wis J I— Civil, Part II, 2405. While economic duress is similar to fraud, there may be circumstances where the "benefit of the bargain" rule will not adequately compensate the injured party for the losses suffered. The "benefit of the bargain" rule and the "out-of-pocket" rule have been exhaustively analyzed in *Selman v. Shirley,* 161 Or. 582, 85 P.2d 384, 91 P.2d 312, 124 A.L.R. 1 (1939). In *Selman,* the court concludes that neither rule should be applied inflexibly. If applying the "benefit of the bargain" rule results in permitting a party to benefit from his own wrong, the injured party will not be fully compensated and the result will be inequitable and unjust. Thus, the injured party should be permitted to choose

between the "benefit of the bargain" rule or the "out-of-pocket" rule depending on which rule will more fully compensate him for the losses suffered as a result of the duress. *Horweger v. Wilcox,* 16 Wis.2d at 534–35, 114 N.W.2d at 823 (Hallows, J., dissenting). We hereby adopt this rationale for the damage issue in economic duress cases. Either the "out-of-pocket" measure of damages or the "benefit of the bargain" measure of damages may be used at the option of the injured party. However, before any damages may be awarded, the burden is on the injured party to prove the damages to a reasonable degree of certainty by the greater weight of the credible evidence. *Lang v. Oudenhoven, supra;* Wis J I—Civil, Part II, 1705. In appropriate cases, punitive damages may also be awarded.

*By the Court.*—Judgment reversed and cause remanded with directions to enter judgment in favor of the defendant.

MOSER, P.J. (concurring). I concur with reversing the trial court and use of the doctrine of economic duress.[1] I do not concur in the majority adoption of economic duress as an intentional tort. I believe the doctrine of economic duress is a quasi-contractual cause of action designed to prevent unjust enrichment.[2] I would limit recovery to the overpayment, even though the means by which payment was induced are assumed to be improper. I am of the opinion that my view of the doctrine of economic duress comports with previous decisions of the Supreme Court of Wisconsin.[3]

[1] *Minneapolis, St. Paul & Sault Ste. Marie Railway Co. v. Railroad Commission,* 183, Wis. 47, 56, 197 N.W. 352, 355 (1924); *Mendelson v. Blatz Brewing Co.,* 9 Wis.2d 487, 494, 101 N.W.2d 805, 809 (1960).

[2] *E.g.,* Dawson, *Economic Duress—An Essay in Perspective,* 45 Mich. L. Rev. 253, 282–83 (1947).

[3] *Guetzkow Brothers Co. v. Breese,* 96 Wis. 591, 72 N.W. 45 (1897).