FIRST NATIONAL SAVINGS FOUNDATION, INC., and another, Appellants, vs. SAMP, DIRECTOR OF DEPARTMENT OF SECURITIES, Respondent.

*October 8—December 4, 1956.*

For the appellants there was a brief by *Rieser, Mathys, Mc-Namara & Stafford* of Madison, and *McLeod, Donohue & Colwin* of Fond du Lac, and oral argument by *Clifford G. Mathys* and *Kenneth M. McLeod*.

For the respondent there was a brief by the *Attorney General* and *Roy G. Tulane,* assistant attorney general, attorneys, and *Werner A. Wilking,* special assistant attorney general, of counsel, and oral argument by *Mr. Tulane* and *Mr. Wilking*.

WINGERT, J. 1. The first question presented by the appeal is whether the "Guaranty Estate Plan" issued by the plaintiff Foundation and sold to the public is a "security," as defined by sec. 189.02 (1), Wis. Stats., which must be registered pursuant to sec. 189.13. We answer this question in the affirmative, and hold that the circuit court was correct in so declaring.

The Guaranty Estate Plan comprises three principal elements, namely, a contract between . the investor and the Foundation, a life insurance policy issued by a life insurance company, and a savings account in a federal savings and loan association.

The plan calls for the making of monthly payments by the investor to the Foundation for about fourteen years, the exact period depending upon the rapidity with which the deposits in the savings account plus the distributions of earnings credited to the account by the savings and loan association reach a specified amount. Out of the first ten payments thus made the Foundation retains a part as its compensation, and the balance of the first ten payments, and nearly all of the later payments, are disbursed by the Foundation in payment of premiums on a life insurance policy on the life of the investor and in payments to the federal savings and loan association for credit to the investor's savings account. The life insurance policy and the savings and loan account are the property of the investor, but the policy and the savings-account passbook are held in escrow by the Foundation. When all payments required to keep up the life insurance premiums and bring the withdrawal value of the savings account to the figure described as the "savings objective" have been completed, the plan matures, the contract between the investor and the Foundation terminates, the investor may cash or continue in force the life insurance and the savings account, and the escrow of the insurance policy and the passbook ceases. If the investor dies prior to the maturity of the plan,

the life insurance company will pay his beneficiary a sum of cash and a monthly income, and will pay to the Foundation the amounts required to be transmitted by it to the savings and loan association for the balance of the fourteen-year period or until the account reaches the specified withdrawal value.

Giving an idea of the relative payments and benefits involved, an exhibit in the record indicates that a $2,000 unit of the plan involves payment of $15.78 per month for the first eleven years and $14.42 per month for the next three years and $10 per month thereafter, the payments to cease, however, as soon as the savings account in the savings and loan association reaches a withdrawal value of $2,000 exclusive of a one per cent bonus for regular payment. The life insurance policy obtainable under the plan for a male investor age thirty-five will have a cash surrender value of $446 or a paid-up value of $754 at the maturity of the plan or will be carried as extended term insurance for $2,000 for approximately nineteen additional years, and will pay upwards of $2,500 in case of the investor's death before maturity. The Foundation's compensation taken out of the first ten payments will be $100.

When a prospect has been persuaded to invest in the "plan" he signs six documents, to wit: (1) A "Savings-Service Agreement" of about 800 words in which he agrees to make specified monthly payments and which sets forth some of the features of the plan, (2) an application to a federal savings and loan association for membership and a savings account, (3) a "Member's Bonus Agreement" with the savings and loan association in which he agrees to make regular monthly payments until the participation value of his savings account reaches a specified sum, (4) an application for life insurance addressed to a life insurance company, (5) an amendment to such application providing that in the event of his death within fourteen years, a portion of the policy proceeds shall

be paid to the savings and loan association, and authorizing delivery of the policy to the Foundation, and (6) an "Escrow and Transfer Agreement" of 600 words addressed to the Foundation, authorizing it to hold his savings-account passbook in escrow, designating beneficiaries to receive the savings account in the event of his death within fourteen years, and containing other provisions and authorizations.

The Foundation then delivers the application for life insurance to the life insurance company, which issues a life insurance policy in the name of the investor and delivers it to the Foundation, also delivering to the investor a certificate that it has so issued and delivered the policy. On receipt of the eleventh monthly payment the Foundation delivers the application for a savings account and bonus agreement to the savings and loan association which in turn issues the usual savings-account passbook in the name of the investor and delivers it to the Foundation, and writes a letter to the investor advising him that the Foundation has opened a savings account in his behalf, which will have a stated cash value on maturity, that he will be entitled to a one per cent bonus at maturity on certain conditions, and that the passbook which controls his account has been delivered to the Foundation.

When the preliminaries have been completed, the Foundation issues to the investor an "Escrow Service Contract," a document of four pages and over 3,000 words, which has elaborately engraved back and margins causing it to resemble in physical appearance a common form of corporate bond. It is therein provided that the Escrow Service Contract, together with the application for it, and the Escrow and Transfer Agreement previously executed, shall constitute one and the entire agreement between the Foundation and the investor. Thus the contract between the parties is to be found in three separate documents containing about 4,500 words. This contract is hereinafter referred to as the "Plan."

The appellants place great emphasis on the argument that the contract is merely a service agreement in which the Foundation agrees to perform services for the investor such as forwarding his payments, and hence is not a security. It is therefore pertinent to look at the contract more closely. Some idea of its contents and phraseology may be had from the following provisions immediately following the caption on page 1 of the Escrow Service Contract:

"RICHARD ROE (as principal) the holder of record, of this Escrow Service Contract, upon payment to the: FIRST NATIONAL SAVINGS FOUNDATION, INC. (as Escrow and Transfer Agent), of the monthly payments as specified in the schedule of payments in part one (1) page two (2) hereof, which payments shall be payable monthly in advance on the 1st day of each month, and upon maturity of the savings share account, and subject to the terms and provisions of said account and life insurance policy of the holder hereof, both of which are held in escrow hereunder, said holder may exercise one of the settlement options as specified in part four (4) page three (3) hereof, and receive such sums or settlements directly from the savings and loan association and life insurance company respectively." (Sic.)

After a minor provision, the contract then proceeds as follows, under the heading, "Savings Objective:"

"A CASH VALUE of Two Thousand Four Hundred Forty-Six and No/100 Dollars ($2,446). Consisting entirely of the Matured Cash Value of the Savings Share Account, (PLUS AN EXTRA 1% PER ANNUM AS A BONUS) payable by the Savings and Loan Association, for Systematic Payment to the Maturity of said Account, and the Cash Surrender Value of the Life Insurance Policy. OR: 'A Paid-up Value' of Two Thousand Seven Hundred Fifty-Four and No/100 Dollars ($2,754) Consisting entirely of the Matured Value of the Savings Share Account (PLUS AN EXTRA 1% PER ANNUM AS A BONUS), payable by the Savings and Loan Association, for Systematic Payment to the Maturity of said Account, and the Paid-up Insurance Value of the Life Insurance Policy.

"THE FIRST NATIONAL SAVINGS FOUNDA-
TION, INC., IS HOLDING IN ESCROW A SPECIAL
INCOME POLICY, TO PROVIDE FOR PAYMENT
OF THE MONTHLY SAVINGS PAYMENTS TO
THE SAVINGS AND LOAN ASSOCIATION, FOR
CREDIT BY IT IN THE SAVINGS SHARE AC-
COUNT OF THE HOLDER HEREOF, FOR THE
BENEFIT OF THE DESIGNATED BENEFICIARY
OR BENEFICIARIES OF SAID HOLDER, IN THE
EVENT OF HIS OR HER DEATH WITHIN FOUR-
TEEN (14) YEARS FROM DATE HEREOF.

"This Contract is issued and accepted subject to the terms,
provisions, and settlement options of the Savings Share Ac-
count and Life Insurance Policy of the Holder hereof, held
in Escrow Hereunder, and the provisions contained in the
subsequent pages hereof."

The remainder of the Escrow Service Contract, occupying
three large pages, is divided into seven parts. Part 1, headed,
"Schedule of Payments and Maturity of Savings Objective,"
provides in elaborate verbiage that the registered holder of
the contract, on completion of specified monthly payments to
the Foundation for fourteen years, or until the earlier or
later achievement of the specified withdrawal value of the
savings account, shall on surrender of the contract be en-
titled to a choice of one of the settlements outlined in part
4, and to receive such settlements directly from the savings
and loan association and the life insurance company.

Part 2, entitled "Savings Share Account and Insurance
Policy Issued and Registered in the Name of the Holder
Hereof," provides that the Foundation will open and hold
in escrow a savings share account in a specified amount in
the savings and loan association, and recites that the Founda-
tion has received and is holding in escrow a life insurance
policy in the holder's name.

Part 3, entitled "Payments to Association and Insurance
Company" provides that the Foundation, as the holder's

agent, will transmit the monthly payments to the savings and loan association and the insurance company as authorized in the application first above outlined, and upon receipt of the monthly payments from the holder, will deposit the amounts thereof to be transmitted in a trust bank account separate and apart from the funds of the Foundation, pending transmittal.

Part 4, entitled "Memorandum of Rights, Benefits and Values" in large letters, followed by "Under Savings Share Account and Life Insurance Policy" in much smaller letters, describes the options which the holder may exercise on maturity of his savings share account in the savings and loan association, and the cash and loan values provided by the life insurance policy, and the settlements available in event of death.

Part 5 provides for the delivery of the insurance policy to the named beneficiary on the holder's death. Part 6 provides that the holder shall have the option of canceling the Escrow Service Contract at any time on thirty days' notice, in which event he will receive the life insurance policy and the savings share account. Part 7 relates to automatic cancellation provisions. Part 8 provides that neither the association, the insurance company, nor the Foundation is ever acting in any manner for the other and shall not be liable for any of the obligations, undertakings, or benefits undertaken by the others.

The Foundation takes its compensation in advance out of the first ten monthly payments, and deposits in the savings share account commence only with the eleventh monthly payment. There is no provision for refund of any part of the amount thus retained by the Foundation in the event of termination of the contract prior to the expiration of the full fourteen-year period. Neither does the contract contain any provision for the accumulation of a reserve by the Foundation to assure completion of its service obligation over the

fourteen-year period, and there is testimony that no such reserve is set up.

There is no provision in the contract for furnishing of periodical statements of his account to the investor, nor requiring that he be furnished periodically with evidence that the payments made by him to the Foundation have been transmitted to the insurance company and the savings and loan association as they should be.

On the outside cover of the Escrow Service Agreement, which is decorated to look very much like an ordinary bond, appears the following:

Number

_____

GUARANTY ESTATE PLAN

Paid-Up Value
$2,754.00
at Maturity
FIRST NATIONAL SAVINGS
FOUNDATION, INC.
Milwaukee, Wisconsin

Issued to
RICHARD ROE
MILWAUKEE, WISCONSIN
Dated
December 1, 1951.

We have examined the contract thus issued by the Foundation with care, and find it complex, difficult to analyze and understand, and confusing. While the meaning is not beyond the power of a lawyer to determine by intensive examination, we think the ordinary small investor would be quite likely to misapprehend his rights and could easily be misled by the contract.

Is this contract a "security" as defined in sec. 189.02 (1), Wis. Stats.? If it is a security, its registration is required by sec. 189.13, for it does not fall within any of the exemptions specified by secs. 189.05 and 189.06.

Sec. 189.02 (1), Wis. Stats., defines "security" as follows:

" 'Security' includes any stock, treasury stock, bond, note, debenture, or evidence of indebtedness; any interest, share, or participation in any profits, earnings, profit-sharing agreement, property, leasehold, royalty, patent right, copyright, trade-mark, process, formula, or oil, gas, or other mineral right; any collateral trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting trust certificate, certificate of deposit for a security, or any membership in a corporation without capital stock; any certificate of interest or of participation in, temporary or interim certificate for, receipt for, guaranty of, or warrant or right to subscribe to or purchase any of the foregoing; and without limitation by reason of the foregoing any instrument commonly known as a security. The term 'stock' includes shares of beneficial interest in a business trust, as well as all other securities commonly known as stock."

This definition has been largely expanded since the original simple definition, by extensive revisions in 1931 and 1939. The intention of the legislature is apparent to give "security" a wide coverage, and to enact a definition flexible enough to reach novel and ingenious devices as well as the more conventional securities. The Securities Act is to be construed liberally, to carry out its purpose of protecting investors and restraining the sale of improvident securities. *Klatt v. Columbia Casualty Co.* 213 Wis. 12, 21, 250 N. W. 825; *State v. Eisbach,* 263 Wis. 554, 556, 57 N. W. (2d) 725. As said by the supreme court of the United States with reference to a comparable federal statute:

"However, the reach of the act does not stop with the obvious and commonplace. Novel, uncommon, or irregular devices, whatever they appear to be, are also reached if it be

proved as matter of fact that they were widely offered or dealt in under terms or courses of dealing which established their character in commerce as 'investment contracts' or as 'any interest or instrument commonly known as a "security" '." *Securities & Exchange Comm. v. C. M. Joiner Leasing Corp.* 320 U. S. 344, 351, 64 Sup. Ct. 120, 88 L. Ed. 88.

We consider that the Guaranty Estate Plan, as evidenced by the Escrow Service Contract and allied documents, falls within more than one of the categories specified in the definition of "security." In its context it is an "investment contract," since it embodies and sets forth the terms of an investment plan and recites the benefits to which the investor is entitled, even though on close reading the issuer itself does not undertake or guarantee payment of those benefits beyond its own service; or a "certificate of interest in property" since it recites and describes in detail the interest of the investor in the insurance policy and savings and loan account held in escrow by the Foundation; or a "certificate of deposit for a security" since it specifically provides that the insurance policy and the savings share account are to be deposited with and held for the investor by the Foundation. The contract is dressed up and embellished to look like the common conception of a security, and it probably falls within the category of "any instrument commonly known as a security." Without definitely deciding which of those terms most aptly describes it, we are satisfied that it is a "security" within the statutory definition.

Appellants argue that the plan is merely a contract for the performance of certain services, and that it is not a "security" because it does not confer upon the investor a share in any property or profits of the Foundation and does not obligate the Foundation to make any payments to him. The contention is that the investor himself signs the application for an insurance policy and a savings account, and the policy is issued and the account opened in his name, and they are his

sole property, and the Foundation merely agrees to transmit the applications and the premiums and the deposits and to hold the policy and the passbook for convenience, all as agent of the investor.

That analysis, while it may be substantially accurate in strict legal effect, does not necessitate the conclusion that the contract is not a security. Anyone but the proverbial Philadelphia lawyer who looks at the contract without diligent analysis, is likely to get the impression that the Foundation is undertaking to pay the investor a cash amount at the maturity of the contract, furnish him insurance benefits, etc. For example, at the top of page 3 appears, in large fancy type, the caption, "Memorandum of Rights, Benefits and Values," below which, in much smaller type, are the words "Under Savings Share Account and Life Insurance Policy." The balance of the page is taken up in a recital of the rights which the investor has under the life insurance policy and the savings and loan account, set up in such a way that the investor might think that the Foundation is undertaking to pay or procure those benefits for him. Under the caption "Settlement Options," the contract says "Upon maturity of the savings share account, the *holder hereof* may exercise one of the following options of settlement to wit:" etc. And again, under the caption "Cash and Loan Values," it reads "The cash value available to the *holder hereof,* subject to the terms and provisions of the savings share account and life insurance policy of the holder hereof, shall at all times be" etc. A document may be a "security" by purporting to be one. See *State v. Eisbach,* 263 Wis. 554, 57 N. W. (2d) 725.

Appellants also point out that both the insurance company and the savings and loan company involved in the plan are regulated under other laws. That fact alone, however, does not exempt the plan from regulation under the Securities Act. Securities issued by many extensively regulated enterprises are subject to ch. 189, Wis. Stats., and must be registered

unless expressly exempted by sec. 189.06, Stats. No one contends that either the life insurance policy or the savings account must be registered under sec. 189.13, and we hold only that the contract issued by the Foundation must be so registered.

Appellants forcefully assert that they are honest and reputable, that the Guaranty Estate Plan is economically sound, and that it fulfils a useful function and is a good investment. Nothing herein is intended to suggest the contrary. The same may be said of hundreds of stocks and bonds of the conventional sort and the companies that issue and sell them, but they are nevertheless subject to regulation under the Securities Law. The coverage of the statute is not limited to dishonest or dubious schemes. The question before us is whether the contract is a "security," and not whether it is a good investment.

On the other hand, in determining whether a given type of contractual agreement is within the scope of the statute the possibility of abuse by the careless or unscrupulous may be relevant, in view of the obvious purpose of the legislature to protect investors. If it is not a "security" when issued by a responsible enterprise, it can hardly be one when availed of by a fraudulent or unsound operator; and *vice versa*. The sort of plan exemplified by the Guaranty Estate Plan seems quite susceptible to abuse and imposition on unwary or inexperienced investors. The service charges might be too large. Being payable in advance, they might be lost or misappropriated long before the service has been fully performed. The issuer might be financially shaky or unable to continue performance. Unsound and unregulated enterprises might be substituted for the insurance company and the savings institution. The contract is scarcely understandable by a layman, and the nature of the plan, its benefits, and the limited contractual obligation of the issuer might be grossly misrepresented.

We have been cited to no cases, and have found none, in which this particular sort of contractual arrangement has been held to be, or not to be, a "security." A number of decisions illustrate the basic principle that the Securities Law should not be narrowly limited to the familiar and customary types of arrangement mentioned in the definition of "security," but should rather be considered flexible enough to reach unconventional and ingenious devices, and should be construed liberally to carry out the purpose of protecting investors. We think they support our conclusion. See, for example, *Brownie Oil Co. v. Railroad Comm.* 207 Wis. 88, 240 N. W. 827; *State v. Unger,* 237 Wis. 318, 296 N. W. 629; *Securities & Exchange Comm. v. C. M. Joiner Leasing Corp.* 320 U. S. 344, 64 Sup. Ct. 120, 88 L. Ed. 88; *Securities & Exchange Comm. v. Howey Co.* 328 U. S. 293, 66 Sup. Ct. 1100, 90 L. Ed. 1244; *Securities & Exchange Comm. v. Crude Oil Corp.* (7th Cir.), 93 Fed. (2d) 844; *State v. Gopher Tire & Rubber Co.* 146 Minn. 52, 177 N. W. 937.

2. The circuit court adjudged that interests in the share capital of a federally chartered savings and loan association are securities which, though exempt from registration, can be sold in Wisconsin only by licensed dealers. As so phrased, the adjudication is unnecessarily broad, and should be modified to declare that a dealer's license is required for the plaintiffs' transactions with respect to the savings accounts in federally chartered savings and loan associations disclosed by the record in this case. As so modified, we affirm the trial court's determination. For the moment we defer considering whether the Foundation or Culp or both should have the license.

Sec. 189.03, Wis. Stats., provides that "No dealer shall act as such unless such dealer is a licensed dealer;" in other words, if one is a dealer, he must have a license.

Sec. 189.02 (5), Wis. Stats., defines "dealer" thus:

" 'Dealer' includes every person, not an agent, who in this state engages in the business of purchasing or selling securities or executing orders for the purchase or sale of securities issued by others," with exceptions not here material.

The savings accounts in the federal savings and loan association now before us are "securities" as defined in sec. 189.02 (1), Wis. Stats. They have some of the characteristics of a savings bank account, but they also have some important features of corporate stock. The passbook certifies that the depositor "holds a savings account representing share interests in" the association. The federal statute provides that "such associations shall raise their capital only in the form of payments on such shares as are authorized in their charters, which shares may be retired as is therein provided" (Title 12, U. S. Code, sec. 1464 (b)). The rules and regulations for the federal savings and loan system define "capital" as "the aggregate of the payments on savings accounts in a federal association, plus earnings credited thereto, less lawful deductions therefrom" (Title 24, C. F. R. Supp., sec. 141.3), and state that "savings account" means "the monetary interest of the holder thereof in the capital of a federal association, and consists of the withdrawal value of such interest" (sec. 141.4). "Withdrawal value" is "the amount paid on a savings account in a federal association, plus earnings credited thereto, less lawful deductions therefrom," (sec. 141.6). "Holders of savings accounts for which application for withdrawal has been made shall remain holders of savings accounts until paid and shall not become creditors," (sec. 144.1–6). All holders of the accounts are members of the association, and each may cast one vote for each $100 or fraction thereof of the withdrawal value of his account, in the consideration of all questions requiring action by members of the association, (sec. 144.1–4). The rules and regulations further provide for semiannual distribution of net earnings of the association on its savings account, ratably, to the with-

drawal value thereof; and in the event of liquidation, dissolution, or winding up of the association, holders of savings accounts are entitled to equal distribution of assets, prorated, (sec. 144.1–10).

We need not determine the exact legal nature of these savings accounts, for clearly they are "any interest, share, or participation in any profits, earnings . . . or property," and probably are either "stock" or "memberships in a corporation without capital stock." Hence they are "securities." Recognition of this fact may be found in the provision of sec. 189.06, Wis. Stats., that "The following securities may be sold without registration . . . (8) . . . any securities issued by a savings and loan association chartered and supervised by the federal government or any agency thereof."

The exemption of the savings and loan accounts from registration does not exempt dealers in them from the requirement of dealers' license. The definition of "dealer" in sec. 189.02 (5), Wis. Stats., excludes dealers in certain securities and in certain situations, but does not exclude all securities not required to be registered.

The savings accounts being "securities," the plaintiffs are, or one of them is, engaged in the business of "selling securities or executing orders for the purchase or sale of securities issued by others" within the above-quoted definition of "dealer" in sec. 189.02 (5), Wis. Stats. The terms "sale" and "sell" are defined generally in sec. 189.02 (3) (a) as follows:

" 'Sale' or 'sell' includes every disposition, offer, negotiation, agreement, or attempt to dispose of a security or any interest therein, for value; every solicitation of any subscription or order for the purchase of a specific security, for value; and every exchange of a security for another security or for other property; but does not include:" certain exceptions considered later.

This definition obviously includes more than the familiar sale of property by an owner. Plaintiff Culp, either for him-

self or acting for the Foundation, in connection with his sale of the Guaranty Estate Plan, engages in "solicitation of . . . subscription or order for the purchase of a specific security," *i. e.,* a savings and loan account. An application for membership and for a savings account in the savings and loan association is obtained from the investor and transmitted to the savings and loan association, and in due course payments are obtained from the investor and transmitted to the association, and the association in turn opens the account and issues evidence thereof in the form of a passbook in the name of the investor which is delivered to the Foundation. This is either "selling securities" or "executing orders" for their purchase and sale within the statutory definition of "dealer."

In this connection we think it immaterial that an interval of ten months elapses between the investor's application for a savings and loan account, and the actual transmission of the first payment to the savings and loan association which operates to open the account. The transaction is a "solicitation of any subscription or order for the purchase of a specific security," even though it is not consummated for a considerable length of time. It is common practice in the securities business to take orders for securities to be issued in the future, the investor paying when the security is delivered. The instant transaction in savings share accounts seems to be comparable.

It is argued that neither of the plaintiffs is a dealer because under the contract between the Foundation and the investor they act as agent for the investor in his dealings with the savings and loan association, and hence are excluded by the provision of the statutory definition in sec. 189.02 (5), Wis. Stats., that " 'Dealer' includes every person, *not an agent,* who in this state engages in the business," etc. We think, however, that the words "not an agent" refer to an "agent" as defined in sec. 189.02 (7), that is, "every individual, not a dealer, who . . . represents or acts for a dealer

or issuer in the sale of any security." The Foundation is not such an "agent" because it is not an individual, and Culp, who represents the Foundation, is not an "agent" with respect to the savings and loan account unless the Foundation is a "dealer."

It is also urged that plaintiffs do not "sell" the savings and loan accounts within the definition of "sale" and "sell" in sec. 189.02 (3) (a), Wis. Stats., because that definition contains the following express exclusion:

"1. The solicitation or execution by a licensed dealer of orders for the purchase of any security, provided such dealer acts as agent for the purchaser, has no direct material interest in the sale or distribution of such security, receives no commission, profit, or other compensation from any source other than the purchaser, and delivers to the purchaser written confirmation of the transaction which clearly itemizes his commission, profit, or other compensation; or . . ." (Other exceptions not here material.)

This exclusion relates only to licensed dealers, and can hardly be availed of by plaintiffs to escape licensing. Moreover, we consider the exclusion inapplicable for the further reason that in the circumstances of the transactions under consideration, in which the savings and loan accounts are solicited in connection with the sale of the Guaranty Estate Plan and as a part thereof, the plaintiffs have a "direct material interest in the sale or distribution of" the savings accounts. Furthermore, Culp receives a commission from the Foundation in some cases, and directly from the savings and loan association in some other cases in which his solicitation results in the opening of a savings and loan account without purchase of the Guaranty Estate Plan.

The record is not altogether clear as to the relations between the Foundation and Culp, and it is difficult to determine whether the corporation or the individual, or both, is the dealer in savings and loan accounts. The trial judge

expressed the view in his opinion that both must be licensed as dealers, but it is not so adjudicated in the declaratory judgment actually rendered. Hence we do not decide the point, but leave it for administrative determination by the defendant.

3. Finally, it is contended that the activities of the plaintiffs with respect to accounts in federal savings and loan associations are subject to the exclusive regulation of the federal government, and cannot be subjected by the state to the licensing requirements of ch. 189, Wis. Stats. We are not referred to any federal statute or regulation with which ch. 189 conflicts, but the argument is rather that the federal government has occupied the field to such an extent that state regulation in the premises is excluded by implication.

The federal legislation claimed to have that effect is that providing for the organization and supervision of federal savings and loan associations, Title 12, U. S. Code, sec. 1464, and the federal regulations cited to us are those promulgated for the federal savings and loan system by the home loan bank board pursuant to the authority of said statute. We are referred to nothing in either the statute or the regulations, and find nothing, which we interpret as even suggesting any purpose on the part of the congress to prohibit the regulation by the states of solicitors or dealers independent from the savings and loan associations who solicit or consummate the opening of accounts in them. Indeed, neither the statute nor the regulations appear to take cognizance of that sort of enterprise.

Our attention is further called to certain regulations promulgated by the federal savings and loan insurance corporation, for the insurance of accounts in federal savings and loan associations. The regulations specifically cited to us require applicants for insurance who use salesmen, agencies, or other sales plans to submit full details thereof for approval by the insurance corporation, place limits on sales

commissions payable by insured associations, and prohibit inaccurate advertising. We find nothing in all this which implies any purpose to foreclose the states from regulating independent dealers and salesmen such as the plaintiffs. On the other hand, it is significant that the Federal Securities Act of 1933 expressly provides that nothing therein shall affect the jurisdiction of the securities commission of any state over any security or any person (Title 15, U. S. Code, sec. 77r).

We should be slow to read into federal action any implication that the states are foreclosed from legislating in the exercise of the police power to accomplish the objectives of the Securities Act, where congress has not plainly disclosed such an intention.

"It will not be presumed that a federal statute was intended to supersede the exercise of the power of the state unless there is a clear manifestation of intention to do so. The exercise of federal supremacy is not lightly to be presumed. . . . 'It should never be held that congress intends to supersede or by its legislation suspend the exercise of the police powers of the states, even when it may do so, unless its purpose to effect that result is clearly manifested.' *Reid v. Colorado,* 187 U. S. 137, 148." *Schwartz v. Texas,* 344 U. S. 199, 202, 73 Sup. Ct. 232, 97 L. Ed. 231. See also *Meyers v. Matthews,* 270 Wis. 453, 461–463, 71 N. W. (2d) 368, and cases cited; *Penn Dairies v. Milk Control Comm.* 318 U. S. 261, 275, 63 Sup. Ct. 617, 87 L. Ed. 748.

In support of their contention on this branch of the case, plaintiffs cite *People v. Coast Federal Savings & Loan Asso.* (D. C. Cal.), 98 Fed. Supp. 311; *Federal Land Bank v. Bismarck Lumber Co.* 314 U. S. 95, 62 Sup. Ct. 1, 86 L. Ed. 65; *Minneapolis, St. P. & S. S. M. Co. v. Railroad Comm.* 183 Wis. 47, 197 N. W. 352; and *Investors Diversified Services v. Diggles,* 272 Wis. 66, 74 N. W. (2d) 805. In our view all of those cases are readily distinguishable, and none requires the conclusion sought to be drawn from them. In

*People v. Coast Federal Savings & Loan Asso., supra,* it was held that the federal regulation of federal savings and loan associations is exclusive, and hence the states have no power to regulate them. In the instant case, however, Wisconsin is not trying to regulate the savings and loan association, but only an independent enterprise which is soliciting savings accounts in such associations. In *Federal Land Bank v. Bismarck Lumber Co., supra,* congress had expressly provided that federal land banks should be exempt from state taxation, and so the court held that a state tax whose burden fell on such a bank, being in direct conflict with the federal statute, was invalid. *Investors Diversified Services v. Diggles, supra,* also involved a direct conflict between the provisions of state and federal statutes, where of course the state had to yield. *Minneapolis, St. P. & S. S. M. R. Co. v. Railroad Comm.* 183 Wis. 47, 197 N. W. 352, held that in view of the detailed regulation by federal statute of the issuance of securities by interstate railroads such a railroad was not required to obtain authority from the railroad commission of Wisconsin for a bond issue which had been authorized by the interstate commerce commission. The federal legislation involved in that case went far beyond anything in the present case in covering the field and thus giving rise to the implication that congress meant to exclude the states from requiring additional authorizations which might produce conflicts and impair the functioning of the nation's transportation system.

For the reasons stated, we conclude that the application of the Wisconsin Securities Law to the plaintiffs and their activities involved in this case is not excluded by any exercise of federal power.

*By the Court.*—Paragraph 1 of the declaratory judgment is affirmed. Paragraph 2 thereof is modified to declare that a dealer's license is required for the plaintiffs' transactions with respect to savings accounts in federally chartered savings and loan associations, and, as so modified, is affirmed.