William J. SCHALLER, Plaintiff,

v.

LITTON INDUSTRIES, INC., a Delaware
corporation, Defendant.

No. 67–C–90.

United States District Court
E. D. Wisconsin.

Dec. 18, 1969.

Ellis R. Herbon, Milwaukee, Wis., for plaintiff.

John G. Vergeront, Walter S. Davis and Frank C. DeGuire, Milwaukee, Wis., for defendant, William A. Masterson, Los Angeles, Cal., of counsel.

REYNOLDS, District Judge.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, OPINION AND ORDER FOR JUDGMENT

"Matchmaker, matchmaker, make me a match,
Find me a find,
Catch me a catch.
Matchmaker, matchmaker, look through your book and make me a
  perfect match."

.....  "Fiddler on the Roof"

———◆———

This is an action for the payment of a fee for matching up the Louis Allis and Litton corporations which resulted in a merger. The defendant claims that the plaintiff's activities had nothing to do with the ultimate merger of these two corporations, and even if it had, that the plaintiff would be entitled to no fee because he did not have a real estate broker's license.

The action was tried to the court. Evidence was received, both oral and written. The case having been submitted for decision along with post-trial briefs, the Court now makes the following findings of fact and conclusions of law.

The jurisdiction of this court is based on Title 28 U.S.C. § 1332. Plaintiff, William J. Schaller ("Schaller"), is a citizen and resident of the State of Wisconsin. Defendant, Litton Industries, Inc. ("Litton"), is a Delaware corporation with its principal place of business in California. The amount in controversy in this action is in excess of the sum of $10,000.

## ACTIVITIES OF SCHALLER

In 1963, Schaller decided that the Louis Allis Company of Milwaukee, Wisconsin ("Louis Allis"), was a susceptible merger candidate for Litton. Having arrived at this idea, Schaller contacted Litton on November 29, 1963, and talked to Louis Salomone ("Salomone"), an employee in its acquisition department.

Schaller stated that he knew of a potential merger candidate for Litton, and that if Litton chose to act on his suggestion and merged with the potential candidate he would expect to be paid a reasonable fee by Litton. Salomone told Schaller that Litton's policy was not to deal with anyone claiming to represent a merger candidate unless Litton had received a statement in writing that such a person, as Schaller, was the authorized representative of the merger candidate and that he would look to the merger candidate for any fee which might be claimed.[1]

1. In reality, Litton always pays the fee due as a result of a merger, even though it may do so through the candidate corporation's books. When Litton merges with a corporation, it assumes its contingent liabilities along with its assets. If one of the contingent liabilities is the payment of a fee on the completion of the merger, then it follows that it becomes a viable liability after the merger takes place. Thus, at that time it becomes Litton's liability, since one of the effects of the merger is to turn over to Litton all of the assets and liabilities of the acquired corporation.

One of the purposes, if not the main purpose, of the "Litton fee policy" was to make sure that the Litton officers and employees only dealt with bona fide representatives of candidate corporations. When Litton's officers and employees dealt with Schaller, who made it clear that he was not a representative of the candidate corporation, then the "Litton

Schaller told Salomone that he did not represent the candidate and that he would expect his fee to be paid by Litton. Despite Schaller's response, Salomone asked Schaller for basic information regarding the candidate. Schaller then identified the candidate as Louis Allis and provided information regarding the company's product line and history of earnings.

Schaller had further contacts with officers and employees of Litton, and he was aggressive in his attempt to interest Litton in the idea of Louis Allis as a candidate. He initiated the vast majority of the contacts and vigorously pursued them in an effort to interest Litton in his concept of a Litton-Louis Allis merger.

As a result of Schaller's efforts, Litton did develop an interest in Louis Allis as a potential merger candidate. Following Schaller's initial contact in November 1963, several Litton inter-office memos were circulated regarding Schaller's proposal. As early as December 10, 1963, Vice President Seymour Rosenberg ("Rosenberg") directed Don Green ("Green"), another member in Litton's acquisition department, to prepare a report on Louis Allis and its acquisition potential.

Litton knew that Schaller was not then, had not been in the past, and would not be in the future the authorized agent of Louis Allis. Litton knew specifically that Schaller had sought such authorization from John Allis, the president of Louis Allis, in early December 1963 and had been flatly refused.

Litton's officers and employees told Schaller on many occasions that they would not deal with him unless and until he had received authorization from Louis Allis, but they continued to deal with him without such authorization. In fact, they indicated that an exception to the Litton general fee policy could be arranged if Schaller's lead and information proved

to be interesting enough. Roy Ash ("Ash"), the president of Litton, for one, implied in his December 6, 1963, telephone conversation with Schaller that an exception to the policy might be made in his case.

Litton, despite its knowledge that Schaller did not represent Louis Allis and was looking to Litton for payment of his fee, continued to discuss the subject of acquisition with Schaller and elicited additional information from him about Louis Allis. In a telephone conversation of December 6, 1963, Ash asked Schaller to send him further information which Schaller did in a letter to Ash dated December 7, 1963. During December of 1963, Schaller had approximately eighteen telephone conversations with Green. On these occasions Green continued to discuss Louis Allis with Schaller. At no time during these conversations did Green ever refuse to continue the discussions about the Louis Allis merger, even though he knew that Schaller had received no authorization from Louis Allis.

On December 31, 1963, Rosenberg told Schaller over the phone that Litton could not deal with him unless he was the authorized representative of Louis Allis and was not looking to Litton for any fee. Rosenberg then advised Schaller that if he could establish himself as an authorized representative of Louis Allis, he should contact Joseph Imirie ("Imirie"), another vice president of Litton, as to all further matters concerning Louis Allis, since Imirie would be the one to pursue the merger.

On January 6, 1964, only six days later, Schaller contacted Rosenberg, stating that he had made arrangements for a meeting between a Litton official and John Allis. Despite Litton's knowledge that Schaller had no authorization to represent Louis Allis, Rosenberg proceeded to place Imirie in contact with Schaller.

---

fee policy" became irrelevant to the question of his fee.

The reason I deal with this question at such length in this opinion is because of

the great emphasis that Litton placed on it at the trial and in their briefs.

On January 8, 1964, Imirie came to Milwaukee and met Schaller. They spent the evening together discussing Louis Allis.

On January 9, 1964, as a result of Schaller's efforts, a meeting was held in the offices of John W. Allis between Allis, Imirie, and Schaller. One Howard Pihl, an employee of Louis Allis, was also present for a portion of the time. The subject of the meeting was the possible merger of Louis Allis and Litton.

As a result of this meeting, Allis and Imirie agreed that Litton would make an offer which Louis Allis would consider. Inter-office memos of Litton following this meeting indicate that both Imirie and Rosenberg were of the opinion that Louis Allis was a worthwhile merger candidate.

On January 13, 1964, John Allis called Imirie and told him that Litton should not pursue any further matters in connection with the Litton-Louis Allis merger since any offer would be rejected. John Allis was disturbed by the fact that other parties had knowledge of their discussion, and he blamed Schaller for this leak. John Allis also repeatedly stated throughout all of these negotiations that Louis Allis was "not for sale." But then, of course, the negotiations were about a merger and not a sale.

At about the time of John Allis' rejection phone call, Schaller suggested to Imirie that it might be beneficial to Litton in preparing its offer to Louis Allis to talk with one Clinton Skidmore, a former sales manager for Louis Allis who then lived in California. Imirie agreed with Schaller and asked Schaller if he would make the necessary contact. When Schaller asked whether he should fly out to California to attend the meeting, Imirie responded, "By all means if you can make it," and he did.

On January 14, 1964, Imirie, Skidmore, and Schaller met in California and discussed the proposed merger in general and the following items in particular: (a) the Louis Allis sales projection, (b) the Louis Allis 5-year plan, (c) the

receptiveness of John Allis to a merger, (d) the relationship of members of the Allis family to the company, and (e) the relationship of the various members of the Allis family to each other.

On January 15, 1964, Schaller visited the offices of Litton in Beverly Hills and had separate conversations with Imirie and Rosenberg. In his conversation with Imirie, Schaller told him that despite John Allis' rejection phone call, he (Schaller), still wished to pursue the Louis Allis matter, and that he was looking to Litton for payment of a fee if a merger resulted. Imirie told Schaller that the matter of fees was within the province and responsibility of Rosenberg and made arrangements for Schaller to see Rosenberg. Schaller then saw Rosenberg and stated to him that he wished to make some arrangement for a fee from Litton if he (Schaller) was successful in doing anything further in connection with a Litton-Louis Allis merger. Rosenberg stated that the entire matter appeared to be academic in view of the rejection telephone call from John Allis to Imirie, but that in any event the Litton policy would require Schaller's obtaining authorization from Louis Allis.

Further discussions ensued between Imirie and Schaller regarding acquisition of Louis Allis. On January 31, 1964, at Schaller's suggestion, Imirie wrote to John Allis acknowledging Allis' telephone call of January 13, 1964, which had had the apparent effect of breaking off the current discussions of a Litton-Louis Allis merger, and this letter also contained an expression of hope on the part of Imirie that discussions would be resumed at some later date.

From February 1964 to February 1966, Schaller initiated several contacts between himself and Litton personnel with regard to possible merger with Louis Allis. These contacts occurred at varying intervals and were prompted, for the most part, by business developments which Schaller saw as possible entrees to the reopening of discussions with Louis Allis. These contacts were originated by Schaller and were accepted by Litton.

Litton had a continuing interest in Louis Allis despite the formal turndown which they had received from John Allis. Like Schaller, Litton was waiting for and looking for the opportune time to re-establish contact with Louis Allis.

Also during the period from February 1964 to February 1966, Schaller was actively pursuing his Litton-Louis Allis concept with various officers and directors of Louis Allis, much to the annoyance of John Allis. It appears that these endeavors were aimed at presenting his concept to the Louis Allis shareholders and thus bypassing the initial opposition raised by John Allis.

During the months of November and December 1963, and continuing up to September 1966, Schaller referred to himself as a "corporate broker." In 1965, he listed himself under the heading "Business Brokerage" in the classified section of the Milwaukee telephone directory. Schaller printed "Corporate Brokerage" on his stationery to impress the Litton people.

During the period of 1961 to 1967, in addition to his activities with Litton, Schaller suggested to three other companies the names of potential merger candidates. He did this in the expectation of receiving a fee if a merger took place, but no mergers in fact did take place. In none of these instances did he represent either party. Rather, he acted independently of either party when he attemped to match up corporations and then proceeded on his own in his efforts to arouse the interests of the prospective parties in each other.

Schaller was not licensed by Wisconsin as a real estate broker or a securities dealer.

## ACTIVITIES OF AUSTIN GOODYEAR

While Schaller was seeking to sustain the interest of the parties in his concept, another and independent source of interest in Louis Allis was beginning to develop within what later became part of the Litton organization. The history and development of this interest follows.

For some time prior to 1962, Louis Allis had a close business relationship with the Foote Engineering Company [2] and Hewitt-Robins, Inc. ("Hewitt-Robins"). At about this time, Hewitt-Robins was looking over Louis Allis as a merger candidate. In furtherance of this interest and in order to obtain information, Hewitt-Robins purchased in a street name a share of Louis Allis stock in 1962 and ordered Dun & Bradstreet and brokerage reports on Louis Allis. Austin Goodyear ("Goodyear"), the president of Hewitt-Robins, and John Allis met in the latter part of 1962 and apparently discussed the possibility of a merger to the extent that they exchanged information on each other's companies.

Although a merger did not take place at that time, Hewitt-Robins' interest in Louis Allis continued throughout 1962, 1963, and 1964. On March 19, 1964, a formal analysis and comparison of Hewitt-Robins and Louis Allis was prepared by Hewitt-Robins for the purpose of evaluating Louis Allis as a merger candidate.

In the meantime and insofar as this lawsuit is concerned, and independently of any of the mergers herein discussed, Hewitt-Robins had some internal shareholder problems. In order to avoid a cash tender offer by a dissident shareholder, Goodyear contacted Ash of Litton and suggested that Litton acquire Hewitt-Robins. Such negotiations took place, and a merger between Hewitt-Robins and Litton was accomplished in February 1965.

When this merger was announced in the Wall Street Journal on November 23, 1964, Schaller called Imirie and advised him that this merger was the key to the Louis Allis-Litton merger because of the historical relationship between Louis Allis and Hewitt-Robins.

In the course of the Hewitt-Robins-Litton negotiations and subsequent to their merger (when Hewitt-Robins be-

2. Hewitt-Robins, Inc., acquired Foote Engineering Company.

came a division of Litton and Goodyear became a vice president of Litton), Goodyear, Ash, and sometimes Rosenberg had numerous discussions concerning other merger candidates that might be pursued by the newly-acquired Hewitt-Robins division. Goodyear, not knowing of the previous experience that Litton had with Louis Allis, suggested Louis Allis. This suggestion naturally struck a familiar chord with the other Litton officers because of the groundwork that had been done by Schaller. Goodyear was assigned the task of wooing Louis Allis.

In August 1965, Goodyear commenced his courting of Louis Allis by sending John Allis material on the Litton corporation. In the latter part of 1965, he personally called on John Allis in Milwaukee, and they had discussions concerning the continuing business relationship between the Hewitt-Robins division of Litton and Louis Allis and the possibility of a merger.

Formal negotiations were commenced in the early part of 1966 with Goodyear representing Litton and John Allis representing Louis Allis. These negotiations continued off and on throughout 1966 and eventually resulted in an agreement calling for the merger of Louis Allis and Litton. The merger was accomplished through the exchange of Litton stock for Louis Allis stock.

Schaller was not initially aware of these negotiations, but in 1966 he began to hear rumors that talks were going on between Litton and Louis Allis. This aroused his curiosity, and he contacted various Litton personnel. At first they denied that any such negotiations had taken place or were in process but later admitted the existence of merger discussions. Schaller then reminded them that he still expected to be paid a fee should a merger take place. The Litton people repeated that their policy on fees would prevent them from paying him. It is interesting to note that in the Litton inter-office memoranda dealing with the Louis Allis merger, the Litton staff mentioned that the problem of paying Mr. Schaller a fee would have to be dealt

with. They were prophetic. Following the public announcement of the Litton-Louis Allis merger, Schaller again sought his fee which was refused.

## CONCLUSIONS OF LAW

### A. IMPLIED CONTRACT

█ It is my opinion that an implied contract existed between Schaller and Litton. Schaller submitted his idea and information to Litton upon the express condition that if Litton followed up on his idea, Litton would pay Schaller a fee for having provided the idea, for having furnished the supporting information, and for having placed the parties in contact—in short, for having matched the parties up—and that Schaller would be paid for his efforts if a merger resulted. Litton knew from the beginning that Schaller did not represent Louis Allis and that he was relying on Litton to pay his fee.

While Litton explained on several occasions that its formal fee policy would prohibit it from paying a fee to Schaller, Litton nevertheless continued to work with Schaller toward a Litton-Louis Allis merger. One who speaks in one way and acts in another should be judged by what he does and not by what he says. In this regard, Litton did tell Schaller that their fee policy prohibited Litton from paying his fee. But at the same time Litton (1) indicated to Schaller that if his lead and information proved interesting enough they would arrange for his fee to be paid; (2) accepted his information regarding Louis Allis and its officers and its principal shareholders; and (3) asked him to use his contacts to arrange meetings (which he did) between Litton personnel and past and present officers of Louis Allis in an endeavor to work out a merger. It was only after Schaller had done everything requested of him and after Litton had the benefit of his services and knowledge that Litton again assumed a position of strict adherence to its general fee policy.

Litton could, from the very beginning, have adhered to its policy of not dealing

with anyone proposing a merger unless that person was the authorized representative of the merger candidate. In this instance, however, Litton decided to deviate from the general policy and to utilize the information and contacts Schaller had to offer. Having done so, I am of the opinion and conclude that an implied contract to pay Schaller for his matchmaking activities, i. e., lead, information, and contacts, arose from Litton's conduct in dealing with Schaller.

## B. CAUSATION

██ Schaller was the first to stimulate Litton's interest in Louis Allis and Louis Allis' interest in Litton. Although John Allis temporarily broke off negotiations between Litton and Louis Allis in January of 1964, there is ample evidence in Litton's inter-office memoranda and conversations, which took place between Schaller and Litton personnel, to conclude that Litton's interest in Louis Allis transcended John Allis' turndown. Litton remained interested in Louis Allis and was only waiting for the opportune moment at which to reopen merger discussions. Schaller attempted to sustain each party's interest in each other by bringing to the attention of Litton various business developments which he saw as possible entrees to the reopening of discussions and by advocating a merger to Louis Allis, its officers and stockholders.

The record further indicates that independent of Schaller, Hewitt-Robins, in the person of Goodyear, became interested in Louis Allis as a potential acquiree for Hewitt-Robins. When Hewitt-Robins and Litton subsequently merged, Goodyear, as a then Litton officer, carried over Hewitt-Robins' interest in Louis Allis and suggested to Litton that Litton renew its efforts to acquire Louis Allis. Litton was receptive to Goodyear's suggestion because its interest in Louis Allis had previously been aroused by the efforts of Schaller.

It is the defendant's contention that Austin Goodyear was an intervening source sufficient to cut off any causal connection between Schaller's matchmaking efforts and the eventual consummation of a merger. The evidence does not support such a conclusion.

Litton argues that without the activities of Goodyear, the merger would not have taken place. This is a "but for" argument and is immaterial to the issues in this case. The same argument could be made in any merger situation because without the activities of certain officers of the companies involved, perhaps the ultimate merger would not take place. In this case, in addition to the activities of Goodyear, we find that Ash was involved in the negotiations as well as Mr. Thornton, chairman of the board of Litton. It may well be true that without the activities of each or all of them, the merger might not have taken place, but that is not the question before this court. The questions involved here are whether Schaller was asked to do a job, whether he did it, and if he did, whether he should get paid.

At no time did Litton or Schaller ever intend that Schaller would take part in the merger negotiations. Schaller was supposed to interest Litton in Louis Allis and Louis Allis in Litton and place them in contact with each other. Having done so, he was entitled to his fee if, as a result of such interest, Litton acquired Louis Allis.

I therefore conclude that a sufficient relationship did in fact exist between Schaller's activities and the merger to entitle Schaller to payment of a fee.

## C. AMOUNT OF SCHALLER'S FEE

██ Although I have found that an implied obligation to pay Schaller's fee is to be found in Litton's extended dealings with Schaller, there was never any express agreement between the parties as to the amount of the fee to which Schaller would be entitled if a merger resulted. It therefore becomes necessary for this court to determine the reasonable value of Schaller's services.

Mr. Stanley Foster Reed of Virginia, an expert on the subject of corporate mergers, testified that Schaller's services had a value of $375,000. He arrived at this figure by applying a percentage to each million involved which was 5% on the first, 4% on the second, 3% on the third, 2% on the fourth, 1% on the next, ½% up to 25 million, and ¼% on the amount above 25 million. He applied this formula to the value of the Louis Allis stock, which was 30 million dollars, and it came out to be $375,000. He also testified that the enrichment to the Litton stockholders (i. e., increase in the public value of the stock) was 60 million dollars as a result of this merger.[3]

Schaller testified that he should be paid $500,000. He based this on fee schedules published in the field.

Based on the evidence before this court, I conclude that Schaller's fee for his services to Litton should be $375,000.

## D. LACK OF REAL ESTATE BRO-KER'S LICENSE

■ Litton contends that Schaller's cause is barred in any event by Chapter 136 [4] (real estate brokers) of the Wisconsin Statutes because he did not have a real estate broker's license. Of course, if an act of Schallers came within the scope of the statute, then his cause would be barred. George Nangen & Co. v. Kenosha Auto Transport Corp., D.C., 238 F.Supp. 157 (1965). Therefore, it becomes necessary to further examine his activities, and in the light of Chapter 136, to see if he is seeking compensation "for the performance of any act mentioned in" the real estate broker's statute.

Schaller is an enterprising man who moves in the business and financial circles of Milwaukee. He graduated from law school after World War II, but has never practiced law. He belongs to clubs that businessmen belong to and plays golf with them at their country clubs. He might be characterized as an "operator." He functions out of his home. He analyzes corporations, their officers, and their owners. In this case, he knew well the members of the Allis family who owned the controlling interest in Louis Allis. In fact, he had at one time been employed by Louis Allis and had been a close friend with John Allis and other members of the family. He still may be friendly with other members of the Allis

3. Mr. Reed arrives at this increase in the market value of the Litton stock by comparing the price earnings ("P.E.") ratio of the two companies and applying multiple difference in P.E. earnings ratio (multiplier) times the value of the newly-acquired stock, less the original value of that stock. In this case the P.E. ratio of Louis Allis was 10 to 1 and Litton was 30 to 1. Applying the multiplier of 3 to the value of the Louis Allis stock, one gets 90 million dollars as the total increase in the value of the Litton stock. Since 30 million dollars came from Louis Allis, that much is subtracted to give 60 million dollars as the increase in the value of the stock due to the merger. This assumes that the market price of the stock directly reflects the P.E. ratio, which may not be a valid assumption.

4. The pertinent portions of Chapter 136, Wis.Stats. (1967), provide as follows:
"136.11 Limitation on actions for commissions. No person engaged in the business or acting in the capacity of a real estate broker or salesman within this state shall bring or maintain an action in the courts of this state for the collection of a commission or compensation for the performance of any act mentioned in this chapter without alleging and proving that he was a duly licensed broker or salesman at the time the alleged cause of action arose."
    "136.01 Definitions.
        *        *        *        *.        *
    "(2) 'Real estate broker' means any person not excluded by sub. (6), who:
* * *
    "(d) For another and for commission, money or other thing of value, sells, exchanges, buys or rents, or offers or attempts to negotiate a sale, exchange, purchase or rental of any business, its good will, inventory, fixtures or an interest therein; or
    "(e) Is engaged wholly or in part in the business of selling business opportunities or good will of an existing business or is engaged wholly or in part in the business of buying and selling, exchanging or renting of any business, its good will, inventory, fixtures or an interest therein."

family, but he and John Allis are no longer friendly. He furnished the Litton people not only with his analysis of the corporation but with an analysis of the various members of the family, giving their strong and weak points.

Schaller works independently and never acts as a representative for any party to a merger. While I do not believe that he would hesitate to further one of his conceived combinations by entering into the negotiations of a merger, there is no evidence that he has in fact participated in the actual negotiations of any merger. His value to the potential corporate partners is in interesting them in each other and then utilizing his contacts to place them in a situation conducive to merger discussions. I choose to characterize his activities as "match making." Perhaps a scientist might call him a catalytic agent. As Mr. Reed testified, it is a very important part of a merger transaction and a very valuable service in the sensitive area of corporate integration.

In this case, Schaller not only opened the door to merger discussions by kindling Litton's interest in Louis Allis as a potential acquiree, but he also placed the Litton people in contact with the Louis Allis people. He did not participate in any manner in the merger negotiations.

Schaller did not perform any of the acts of a broker. In fact, he was not even a finder because a finder is hired by one party to find another. Schaller had information and contacts which he offered for sale, and Litton bought them.

Litton argues that the fact that Schaller referred to himself as a "corporate broker," had "Corporate Brokerage" printed on his stationery, and had his phone listed under "Business Brokerage" is indicative of the fact that he was in fact operating as a broker under the real estate statute. These facts are not conclusive. Schaller has met his burden of persuading this court beyond any doubt that he was not acting as a Chapter 136 real estate broker.

■ I think I should say something about the scope of the real estate broker's statute (Chapter 136) and how it is limited by the securities laws (Chapter 189) of the State of Wisconsin, and what effect this has on this case.

In the statutory scheme of these two statutes, Chapter 136 deals primarily with the problem of sales of real estate, sales of those businesses where real estate is included as an asset, and where the sales involve in part legal papers that are ordinarily connected with real estate transactions.[5]

Chapter 189 deals with the problems involved in the transfer of those businesses, or parts of businesses (which may include real estate), where the transfer is effectuated by the transfer of stock or securities. From the point of view of subject matter, Chapter 189 has more to do with this case than Chapter 136.

The Real Estate Board has twice sought an opinion from the Attorney General of Wisconsin, on the question of whether it has jurisdiction over *all* business transfers. Twice the Attorney General has said no.

In 49 Op.Att'y Gen. 4–9 (1960), in discussing the problem of the sale of corporate businesses by means of a stock transaction wherein the respective rights of real estate brokers and securities dealers are analyzed, the Attorney General stated that for a real estate broker to handle such a transaction, he must be licensed as a securities dealer in order to "negotiate for the sale of a corporate business by means of a stock transaction * * *."

In reviewing this opinion six years later, a subsequent Attorney General in 55 Op.Att'y Gen. 152, 153 (1966), reaffirmed the earlier opinion but went on to say that one need not be a licensed securities dealer where the transfer involved is an exempt securities transaction by reason of a specific provision of

---

5. I am aware that it may also cover unincorporated businesses that have no real estate and where there is no sale or exchange of securities.

§ 189.07 [6] of the securities laws. This section provides that the sale of securities by one corporation to another in connection with a merger of both corporations is exempt from securities laws. In the event of a conflict between general and specific statutes, the specific statute controls. Bornemann v. City of New Berlin, 27 Wis.2d 102, 133 N.W.2d 328 (1965).

The Wisconsin Supreme Court held in First National Savings Foundation, Inc. v. Samp, 274 Wis. 118, 80 N.W.2d 249 (1956), that the exemption of savings and loan accounts from registration under the state securities law did not exempt dealers in them from the requirement of a dealer's license because "The definition of 'dealer' in sec. 189.02(5),[7] [Wis.] Stats., excludes dealers in certain securities and in certain situations, but does not exclude all securities not required to be registered." 274 Wis. at 134, 80 N.W.2d at 259. However, the court's decision there turned on the fact that the plaintiffs were actively involved in the process of soliciting subscriptions or orders for the purchase of specific securities. 274 Wis. at 135, 80 N.W.2d 249. That is, they were performing the normal functions of a dealer in securities. Schaller, on the other hand, did not perform the normal functions of a dealer. He was not involved in the

"* * * business of purchasing or selling securities or executing orders for the purchase or sale of securities * * *." § 189.02(5), Wis.Stats. Because of the specific exemption in § 189.07 and the fact that Schaller's function was not that of a dealer, this Court finds that his activities do not dictate that he be licensed as a securities dealer.

I do not believe that his activities are or were subject to any regulatory or licensing law of Wisconsin. If any statute controls, it would be Chapter 189, because it specifically deals with the problem of mergers. There is no indication anywhere that anyone ever thought that those who negotiate mergers should be licensed as real estate brokers. To rule now through judicial interpretation that they should have had a real estate broker's license because they do not have to have a security dealer's license is stretching Chapter 136 way beyond any conceivable scope.

This opinion constitutes the findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

For the foregoing reasons,

It is ordered that the clerk of court enter judgment for the plaintiff in the amount of Three Hundred Seventy-five Thousand Dollars ($375,000.00).

---

6. "189.07 Exempt transactions. * * * the following transactions may be consummated without registration of the security under section 189.13:

  &ast;   &ast;   &ast;   &ast;   &ast;

"(15) (a) The sale of its securities by one corporation to another corporation in connection with a reorganization, recapitalization, consolidation or merger of either or both such corporations, or (b) the sale of its securities, or securities of a company in which it has a controlling interest by one corporation to another corporation where no public offering is involved and distribution of the entire issue of the sale of such controlling interests is to not more than 5 corporations."

The quoted portions of the statute are set forth as amended in 1967. The amendments embody no substantive changes from earlier versions of the statute.

7. "189.02 Definitions. * * *

"(5) 'Dealer' includes every person, not an agent, who in this state engages in the business of purchasing or selling securities or executing orders for the purchase or sale of securities issued by others, except a security exempted by section 189.05, but does not include:

"(a) An executor, administrator, guardian or other officer of the court making any sale under subsection (7) of section 189.07;

"(b) A pledgee making any sale under subsection (8) of section 189.07;

"(c) A person whose dealings in securities are limited to sales exempted by subsections (3) or (4) of section 189.07; or

"(d) A person having no place of business in this state, whose dealings in securities in this state are limited to sales to or purchases from licensed dealers."